**Opinion filed March 14, 2013**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-11-00322-CR, 11-11-00343-CR, & 11-11-00344-CR

_____

## WESLEY DALE KNIGHT, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 70th District Court**
**Ector County, Texas**
**Trial Court Cause Nos. A-37,438; A-37,439; & A-37,440**

## O P I N I O N

In three separate indictments, the grand jury indicted Wesley Dale Knight for the offenses of unlawful possession of a firearm by a felon (No. 11-11-00322-CR), attempted capital murder of Stephen Merrell, a corporal with the Odessa Police Department (No. 11-11-00343-CR), and attempted capital murder of Kolby Kea, also a corporal with the Odessa Police Department (No. 11-11-00344-CR). The trial court consolidated the cases for a trial by jury. The jury found Knight guilty, upon his plea of guilty, of unlawful possession of a firearm by a felon.[1] Knight pleaded not guilty to both of the attempted capital murder charges. The jury found him guilty of

---

[1]We note that the judgment incorrectly indicates that Knight pleaded not guilty to this offense.

the attempted capital murder of Corporal Kea, but it found him not guilty of the attempted capital murder of Corporal Merrell. Instead, as to Corporal Merrell, the jury found Knight guilty of the lesser included offense of aggravated assault of a public servant.

The jury found that certain enhancement allegations were true, and it assessed Knight's punishment at confinement for twenty years and a $10,000 fine for the unlawful possession of a firearm conviction, at confinement for ninety-nine years and a $10,000 fine for the attempted capital murder conviction, and at confinement for ninety-nine years and no fine for the aggravated assault conviction. The trial court sentenced Knight accordingly, and it ordered that the sentences run concurrently. We affirm the trial court's judgment in the cases in which Knight was convicted of attempted capital murder and aggravated assault. We modify and affirm the judgment in the firearm case to accurately reflect that Knight pleaded guilty in that case.

Knight's first issue on appeal is the same in all three cases. In that issue, Knight claims that the trial court erred when, during trial, it reversed its earlier ruling on a pretrial motion to suppress and admitted testimony regarding an interview Knight had given to law enforcement personnel. That is the only issue involved in the possession-of-a-firearm case. There are two other issues in the remaining cases.

In both of the remaining cases, Knight asserts in his second issue that the trial court erred when it instructed the jury, over his objection, on the lesser included offense of aggravated assault of a public servant. Knight argues that the trial court should not have given the instruction because the evidence was insufficient to find that Knight was guilty of that crime beyond a reasonable doubt.

In Knight's third issue in the case involving Corporal Merrell, Knight argues that the State failed to prove all of the statutory elements of the crime of aggravated assault of a public servant. In Knight's third issue in the case involving Corporal Kea, he takes the position that the State failed to prove all of the statutory elements necessary to convict him of attempted capital murder.

We will first discuss Knight's claim that the evidence was insufficient to support his conviction for attempted capital murder of Corporal Kea. We review the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286,

2

288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *Brown v. State*, 381 S.W.3d 565, 573 (Tex. App.—Eastland 2012, no pet.) (citing *Jackson*, 443 U.S. at 314, 318 n.11). If we find that the evidence is insufficient under this standard, we must reverse the judgment and enter an acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 40–41 (1982).

Our law provides that a person commits an offense if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). Murder becomes capital murder under certain circumstances, one of which is when the person murders a peace officer who is acting in the lawful discharge of his official duties and who the person knows to be a peace officer. *Id.* § 19.03(a)(1) (West Supp. 2012). Knight correctly points out, therefore, that, for the jury to find him guilty of the attempted capital murder of Corporal Kea, the State was required to prove beyond a reasonable doubt that Knight, with the specific intent to cause the death of Corporal Kea, intentionally and knowingly discharged a handgun at Corporal Kea; that Corporal Kea was a peace officer acting in the lawful discharge of an official duty; that Knight knew that Corporal Kea was a peace officer; and that the act of discharging a handgun at Corporal Kea amounted to more than mere preparation that tended but failed to effect the commission of the offense.

An attempt to commit an offense occurs when, with the specific intent to commit the offense, a person does an act that amounts "to more than mere preparation that tends but fails to effect the commission of the offense intended." *Id.* § 15.01(a) (West 2011).

Knight was an admitted drug user and dealer. He began using drugs when he was approximately fourteen years old. He started his drug use with marihuana and progressed to cocaine and methamphetamine. Knight sold drugs to support his own drug habit.

Charlie Truman Franks was a patron of Knight's drug business. The events that gave rise to the charges in these cases began when, on the date that these offenses were committed, Knight phoned Franks and asked him to take him to look for a motel room. He wanted to rent the room as a center of distribution for his drug business. According to Franks, while they were driving around looking for a room with the best price, Knight lifted his shirt to show Franks that he had a pistol. He told Franks, "drive straight and then, you know, if we get pulled [over] just be ready." When he testified, Knight denied showing a gun to Franks. However, he did not deny that he had a gun the night of the armed encounter that resulted in the charges involved in this appeal. He had stolen the gun from his brother. He testified that he needed the pistol for protection because drug dealing is an ugly business.

Knight testified that he and Franks found a room at the Super 8 on I-20 in Odessa. Franks rented the room in his name because Knight intended to sell drugs out of the room and Knight did not want the room registered in his name. Knight gave Franks methamphetamine in exchange for his role in renting the room.

Harsic Oza owned and operated the Super 8 motel at which Franks rented the room for Knight. Oza did not approve of the amount of traffic that was coming and going in and out of the room, and he phoned Knight and told him so. Despite that, people continued to come and go, and Oza called personnel at the Odessa Police Department.

In response to a dispatch, Corporal Kea went to the Super 8. When Oza told him about the ongoing activities concerning the motel room occupied by Knight, Corporal Kea recognized that the activities were consistent with drug dealing. Because the room had already been paid for, Corporal Kea thought that he could not make Knight leave. However, he agreed with Oza that he would "stand by" while Oza told Knight to leave.

Oza telephoned Knight, and Knight came to the lobby to talk to Oza. When Knight was stepping out of the elevator, he saw Corporal Kea and tried to get back on the elevator. Corporal Kea stopped him. Oza talked to Knight and eventually asked him to leave the motel. Corporal Kea told Knight to get his things from the room and meet him in the lobby of the motel.

Corporal Kea asked for assistance from a K-9 officer. After Knight returned to the lobby area, Corporal Kea asked Knight to call Franks and tell him to return to the motel to talk with Corporal Kea. Corporal Kea told Knight that, if Franks came to get him before the K-9 unit got there, he would be free to leave. Knight phoned Franks. After Corporal Kea listened to Knight's

4

end of the conversation, he believed that Franks was already in the area and was watching them. There were outstanding warrants against Franks. By this time, Knight had taken his bags outside and was waiting there with Corporal Kea. Franks did not come after Knight but, rather, parked on the opposite side of the parking lot. He was "really, really high," and he knew that, if the police saw him, they would take him to jail. However, the police did locate him. He was lying in the floor of the black Ford Ranger that he had parked in the Super 8 parking lot. They also found approximately ten grams of methamphetamine in the back of the vehicle.

While Corporal Kea and Knight waited on Franks to arrive, Corporal Merrell arrived with his drug dog, Marco. Knight consented to an open-air sniff of his luggage. Marco alerted on a locked backpack. When the officers asked Knight for the key, he told them that the backpack was not his and that he did not have a key. The officers told him that they were going to search him for the key, and they began to walk toward him. Because he thought that the drug dog had not alerted on the backpack and hoped that Corporal Kea had not run his ID, Knight thought there was "a very small chance" that he "might actually walk away from the [motel]." Knight testified that that chance ended when the officers decided to search him for the key to the backpack. He then "back-pedaled" into the parking lot; Corporal Kea followed him. Officer Merrell testified that, at this point, he moved to a position from which he could block any attempt that Knight might make to flee.

Up to this point in time, with the exception of whether Knight showed Franks that he had a pistol, the facts were mostly undisputed in any material respect. It is here that the testimony from the officers at the scene and the testimony from Knight diverge.

Corporal Kea testified that, as he and Corporal Merrell were moving toward Knight, he saw Knight reach into his front waistband and draw out a black pouch; Knight took a pistol from it, leveled his arm, pointed the pistol "straight at [Corporal Kea]," and pulled the trigger. Corporal Merrell was close to Knight and knocked Knight off balance just as he pulled the trigger. The bullet went through a tire on Corporal Kea's police vehicle and lodged in the fender; it had passed some eighteen inches from the place at which Corporal Kea had been standing when Knight fired the shot.

After Knight fired the first shot, his pistol jammed. While Corporal Merrell was taking Knight to the ground, Knight continued to try to un-jam the gun. Corporal Merrell testified that he kept his hand on the slide of the pistol to keep Knight from un-jamming the pistol and

5

shooting more. According to Corporal Merrell, Knight would not have known that the gun was jammed if he had not tried to fire it the second time. All the while, Knight tried to keep the pistol from Corporal Merrell. Corporal Kea attempted to help Corporal Merrell subdue Knight as they wrestled over the pistol. Corporal Merrell testified that he was afraid that his life would end that evening. "[A]nd as far as I'm concerned his intention [was] to kill me. Period. End of story."

Another Odessa Police Department member, Sergeant Michael Sims, came to the motel. He had been looking around the area for Franks. When he returned from the parking lot, he saw the altercation between Knight, Corporal Kea, and Corporal Merrell. Sergeant Sims took his own firearm, put it to Knight's head, and told him that, if he moved again, he would kill him. It was at this point Knight quit resisting the officers, and they subdued and arrested him.

When Odessa police officers examined Knight's property, they found, among other things, syringes, plastic baggies, a scale, a spoon, a propane torch, five knives, six cell phones, and various motel keys. They also found 7.84 grams of methamphetamine.

After Odessa officers arrested Knight, he was first interviewed by Detective Michael Liverett of the Odessa Police Department. This interview took place around 2:00 a.m. to 3:00 a.m. on June 9, 2010, not long after the armed confrontation. Detective Liverett read Knight his *Miranda*[2] warnings, and Knight waived them. Detective Liverett asked Knight what happened, and Knight responded, "I f----d up." Knight did not notice that the drug dog alerted on the backpack and thought that the dog "had just missed it." He also acknowledged that he must have taken the gun out of the holster and that his finger must have been on the trigger or he could not have fired it.

Later that morning, at about 9:30, Knight was taken before a magistrate, and he completed paperwork in which he asked that a court appoint a lawyer to represent him in connection with the charges against him. The next day, June 10, 2010, Sergeant Scottie Smith interviewed Knight. Sergeant Smith was a detective employed by the City of Odessa. Although he worked for the City of Odessa, Sergeant Smith was assigned to the Federal Bureau of Investigation and had been deputized by the U.S. Marshal and by the FBI. He was working on the Gang Safe Streets Task Force when he interviewed Knight.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Sergeant Smith again advised Knight of his *Miranda* rights. Knight once again waived his right to have a lawyer present, and he talked to Sergeant Smith. A lawyer was not appointed to represent Knight until June 11, 2010.

Knight filed a pretrial motion to suppress the results of the interview with Sergeant Smith. He grounded his motion in the Sixth and Fourteenth Amendments to the United States Constitution; Article I, sections 9 and 10 of the Texas Constitution; and Articles 1.05 and 38.23 of the Texas Code of Criminal Procedure, TEX. CODE CRIM. PROC. ANN. arts. 1.05, 38.23 (West 2005). After a hearing on the motion, the trial court granted it with the stated caveat that it might later reconsider the ruling. After Knight testified at trial, the trial court did reconsider its ruling, and at the State's request, it allowed the State to question Knight about certain incriminating statements that he made to Sergeant Smith during the interview.

Some of the incriminating statements that Knight made to Sergeant Smith were these: that he delivered one ounce to one-fourth of a pound of methamphetamine at a time in Odessa and made $1,600 to $1,800 an ounce; that he had delivered four ounces to one-quarter pound of methamphetamine the night of the offense; that he was extremely high on methamphetamine when he was arrested; that he left San Angelo because he was shown on television to be San Angelo's "most wanted," which interfered with his drug business; that he could make more money selling drugs in Odessa; that he had stayed at some eleven motels in the three weeks that he had been in Odessa; that he had numerous cell phones in order to avoid detection by police; that he had cut off his ankle bracelet (he was on parole and there was a warrant out for his arrest); and that he had been on the run for several months. He had earlier testified, in response to questions from his trial counsel and before the trial court had reversed its ruling on the motion to suppress, that he had been convicted twice for possession of methamphetamine and that he had also been convicted for debit card abuse and for burglary of a habitation with intent to commit theft. Furthermore, he testified that he had also been convicted of driving while his license was invalid, of unlawfully carrying a weapon, and of twenty to thirty theft-by-check charges. Knight testified that all of the charges he mentioned were drug related.

In addition to the testimony that we have already outlined above, Knight had the pistol with him when he went down to meet the motel manager the first time. He had the pistol with him when he went back to the lobby to meet with Corporal Kea. He had been shooting all his life and was an excellent shot. Although Knight denied it, the jury heard other testimony that

7

showed that, when it became apparent that he was not going to drive away from the motel a free man but was going to be arrested for any number of reasons, Knight drew the pistol from his belt and fired the gun at Corporal Kea. When we examine all of the evidence that we have outlined above, in the light most favorable to the verdict, we determine that, based on that evidence and the reasonable inferences to be drawn from it, a rational trier of fact could have found the essential elements of the offense of the attempted capital murder of Corporal Kea beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Isassi*, 330 S.W.3d at 638. Knight's third issue in the case involving Corporal Kea is overruled.

In Knight's second issue in the case involving Corporal Kea, he complains that the trial court erred when it instructed the jury on the lesser included offense of aggravated assault of a public servant. However, even if the trial court did err, Knight has not shown any harm because the jury did not find that he had committed aggravated assault upon Corporal Kea. Under the instructions of the trial court, the jury never reached that issue. Knight's second issue in the case involving Corporal Kea is overruled.

We will next address Knight's remaining two issues in the case that involved Corporal Merrell. Because they are interrelated, we will review them together. Knight's claim in the second issue on appeal is that the trial court erred when it instructed the jury, over his objection, on the lesser included offense of aggravated assault of a public servant. In his third issue on appeal, Knight argues that the evidence was not legally sufficient to sustain the jury's finding that Knight was guilty of the offense of aggravated assault of a public servant.

When we determine whether a trial court erred in connection with an instruction on a lesser included offense, we consider the charged offense, the statutory elements of the lesser included offense, and the evidence actually presented at trial. *Hayward v. State*, 158 S.W.3d 476, 478 (Tex. Crim. App. 2005). We employ a two-part test. First, the lesser included offense must be included within the proof necessary to establish the offense charged. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993). Second, some evidence must exist in the record that, if the defendant is guilty, he is guilty only of the lesser offense. *Id.*

Knight makes no claim that aggravated assault of a peace officer, in this case, is not a lesser included offense of attempted capital murder. His claim is that there is no evidence in the record to show that, if he is guilty, he is guilty only of the lesser included offense. Specifically, Knight maintains that the State failed to prove that he ever formed the conscious objective or

8

desire to threaten Corporal Merrell with imminent bodily harm. Therefore, he continues, the trial court erred when it instructed the jury on the lesser included offense of aggravated assault of a public servant, and "the jury erred in finding him guilty of this crime." We will examine the record to see whether there is some evidence to show that, if Knight is guilty, he is guilty only of the aggravated assault, and then we will determine whether the evidence was sufficient to support the jury's verdict that Knight was guilty of that offense.

Chapter 22.01 of the Texas Penal Code directs our inquiry in the case in which Corporal Merrell was the victim. Specifically, insofar as Knight's complaints are concerned, Section 22.01(a)(2) provides that a person commits an offense if the person intentionally or knowingly threatens another with imminent bodily injury. TEX. PENAL CODE ANN. § 22.01(a)(2) (West 2011). Under Section 22.02(a)(2) of the Penal Code, the assault becomes an aggravated assault if the person "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2). Such an aggravated assault becomes a first-degree felony if the person commits the aggravated assault against a public servant who is lawfully exercising his official duties. *Id.* § 22.02(b)(2)(B). Knight directs his only complaint as to the elements of the lesser included offense to evidence of the requisite culpable mental state: that he intentionally and knowingly threatened Officer Merrell with imminent bodily injury.

The Penal Code provides that "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). Furthermore, "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b). A person also "acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.*

Mental culpability is of such a nature that it generally must be inferred from the circumstances under which the prohibited act occurred. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978); *Russo v. State*, 228 S.W.3d 779, 793 (Tex. App.—Austin 2007, pet. ref'd); *Skillern v. State*, 890 S.W.2d 849, 880 (Tex. App.—Austin 1994, pet. ref'd). A culpable mental state may be inferred by the trier of fact from the accused's acts, words, and conduct. *Dues v. State*, 634 S.W.2d 304, 306 (Tex. Crim. App. 1982); *Skillern*, 890 S.W.2d at 880; *Fuentes v. State*, 880 S.W.2d 857, 860 (Tex. App.—Amarillo 1994, pet. ref'd). The question presented here

9

is whether there was some evidence in the trial record that would permit a rational jury to find beyond a reasonable doubt that Knight possessed the requisite culpable mental state: intentionally or knowingly threatening Corporal Merrell with imminent bodily injury.

It is well established that threats can be conveyed in more ways than in a verbal manner; a threat may be communicated by acts, words, or conduct. *McGowan v. State*, 664 S.W.2d 355, 357 (Tex. Crim. App. 1984). A defendant's intent or knowledge is a question of fact to be determined from the totality of the circumstances. *See Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998).

The jury heard evidence that, when Knight realized that he was going to be taken to jail, he drew a pistol from his waistband. He pointed the pistol at Corporal Kea, not at Corporal Merrell. He fired the pistol while pointing at Corporal Kea, not Corporal Merrell. After Corporal Merrell jumped on Knight, Knight continued to wrestle the gun from Corporal Merrell. He pulled the trigger on the pistol a second time or he would not have noticed that it was jammed. Knight testified that he was not trying to shoot or kill anyone. However, he continued to try to un-jam the pistol as he tried to twist it from Corporal Merrell's hand. He remained uncompliant with Corporal Merrell until Sergeant Sims put a gun to his head. Corporal Merrell thought that his life would end that evening.

We hold that the evidence that we have outlined in this opinion is some evidence that, if Knight is guilty, he is guilty only of the lesser included offense of aggravated assault of a public servant. Therefore, the trial court did not err when it instructed the jury on the offense of aggravated assault of a public servant. Further, we believe that the evidence we have outlined in this opinion, together with reasonable inferences from it, constitutes some evidence in the record of Knight's trial that would permit a rational jury to find beyond a reasonable doubt that Knight intentionally and knowingly threatened Corporal Merrell with imminent bodily injury. There is no complaint as to the sufficiency of the evidence as to any of the other elements of the offense. Knight's second and third issues on appeal in the case involving Corporal Merrell are overruled.

The trial court's reversal of its ruling on the motion to suppress is the subject of Knight's first issue in all three cases. He claims that the trial court abused its discretion when it later, during trial, decided to admit evidence of Knight's interview with Sergeant Smith.

At the time that the trial court initially ruled on the motion to suppress, neither the trial court nor the lawyers had the benefit of *Pecina v. State*, 361 S.W.3d 68 (Tex. Crim. App. 2012).

10

In *Pecina*, the court discussed the difference in Fifth Amendment and Sixth Amendment right to counsel cases after the Supreme Court's decision in *Montejo v. Louisiana*, 556 U.S. 778 (2009). *Pecina*, 361 S.W.3d at 73. There, law enforcement officials arrested Pecina for the stabbing murder of his wife. Pecina also suffered some stab wounds and was taken to the hospital. After the officers obtained an arrest warrant, they brought a magistrate to Pecina's hospital room, and then the officers left the room. The magistrate arraigned Pecina in accordance with Article 15.17 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 15.17 (West Supp. 2012). The magistrate asked Pecina if he wanted a court-appointed attorney, and he said that he did. The magistrate then asked Pecina if he still wanted to talk to the officers, and he said that he did.

The officers returned to the room after the magistrate had completed her duties. Pecina reiterated that he wanted to talk with them. One of the officers again advised Pecina of his *Miranda* rights, and Pecina waived them. Pecina later sought to have the trial court suppress the statement that he had given to the officers. The trial court denied the motion.

When it affirmed the decision of the trial court, the Court of Criminal Appeals noted that the Court in *Montejo* clarified the separate purposes and applications of the Fifth Amendment and the Sixth Amendment. "The Fifth Amendment prohibits the government from compelling a criminal suspect to bear witness against himself." *Pecina*, 361 S.W.3d at 74–75. If an accused does not want to talk with authorities, all he has to do is tell them so at the time he receives his *Miranda* warnings. *Id.* at 76. If he tells them that he does not want to talk with them, then further contact by the police is prohibited, as is "badgering" by subsequent requests. *Id.*

On the other hand, the Sixth Amendment right to counsel attaches when the "adversary judicial process has been initiated." *Id.* at 77. The Sixth Amendment guarantees that a defendant has the right to have a lawyer present at the critical stages of a criminal proceeding. Generally, the Sixth Amendment marks the attachment of the right to have counsel present during critical stages of the proceedings. *Id.*

In *Pecina*, the court said that "a Sixth Amendment request for an attorney at an arraignment, initial appearance, or Article 15.17 hearing is a request for the guiding hand of counsel for all judicial criminal proceedings." *Id.* at 78. If an accused wishes to invoke that right during post-arraignment custodial interrogation, he must do so "pursuant to *Miranda*, *Edwards*, and *Minnick* when law enforcement or other state agents embark upon custodial

11

interrogation." *Id.* The court went on to say that both the Fifth and the Sixth Amendments, as far as right to counsel during custodial interrogation is concerned, depend upon the same thing: "what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happened at any preliminary hearing." *Id.* (quoting *Montejo*, 556 U.S. at 797). For purposes of police questioning, the time for an accused to invoke his right to counsel is when law enforcement personnel approach him and warn him of his rights under *Miranda*. What the defendant does at an Article 15.17 procedure "says nothing about his possible invocation of his right to counsel during later police-initiated custodial interrogation. The magistration hearing is not an interrogation event." *Id.* An interrogation event provides the "time and place to either invoke or waive the right to counsel for purposes of police questioning." *Id.*

When the magistrate performed her Article 15.17 functions in these cases, Knight requested appointed counsel. However, it is undisputed that at neither of the two interrogation events involved in this case did Knight request that he have counsel present for the interrogations. An accused must make an unambiguous request for counsel during a custodial interrogation. *Id.* at 79. The request must be such that a reasonable law enforcement officer, under the circumstances, would understand that the statement by the accused was a request that an attorney be present for the interrogation. *Id.* We look at the totality of the circumstances as viewed by an objectively reasonable police officer conducting the interrogation. *Id.*

In the case before us, as did the accused in *Pecina*, Knight agreed to talk with Sergeant Smith after he had received the Article 15.17 magistration. The record shows that, although Knight had a Fifth Amendment as well as a Sixth Amendment right to counsel *for purposes of custodial interrogation*, he did not invoke either. In accordance with the pronouncements in *Pecina*, we hold that Knight waived those rights. And, his decision to waive those rights "need not itself be counseled." *Montejo*, 556 U.S. at 786.

*Pecina* makes it clear that the trial court would have been correct had it originally denied Knight's motion to suppress over Knight's suggestion that his right to counsel had been violated. Even if the trial court's reason for reversing its ruling on the motion to suppress might have been incorrect—and we do not hold that it was—we will uphold the ruling if the evidence is admissible for any reason. *Montejo* and *Pecina* make it clear that the evidence was admissible as against a right to counsel claim.

12

Knight's counsel argues that, if he had known that the trial court would reverse its position on the admissibility of Knight's interview with Sergeant Smith, he might not have called him to testify—he might have changed his strategy. He also maintains that the trial court should have granted his request for a recess so that he could explain what was going on to Knight. The State counters that, at the time that the trial court ruled on the motion to suppress, it gave notice that it might reconsider its ruling. Knight's counsel was aware of that warning when he called Knight to testify. He had an ample amount of time between the time that the trial court originally ruled on the motion to suppress and the time of trial for him to discuss with Knight the adverse effects attendant upon a possible change of position by the trial court. And, the trial court appropriately advised Knight of his right not to testify before he began his trial testimony. He waived that right. As far as a change in strategy is concerned, Knight continually asserted his position that he did not intend to shoot the officers, that he did not point the pistol at the officers, and that the weapon accidentally went off during the struggle. On this record, it is apparent that the jury would not have been presented with that complete position if Knight had not testified. Furthermore, Knight has cited no authority in support of his position regarding surprise or the trial court's failure to allow a recess and he has waived those arguments. TEX. R. APP. P. 38.1(i).

Knight's sole issue in Cause No. 11-11-00322-CR (possession of a firearm by a felon) regarding Knight's interview with Sergeant Smith is overruled. Issue No. 1 in Cause No. 11-11-00343-CR (aggravated assault of Corporal Merrell) and Issue No. 1 in Cause No. 11-11-00344-CR (attempted capital murder of Corporal Kea), also regarding the trial court's reversal of its position on the admissibility of Knight's interview with Sergeant Smith, are overruled.

The judgment of the trial court in Cause No. 11-11-00322-CR is modified to reflect Knight's plea of "GUILTY" to the offense and, as modified, is affirmed. The judgments of the trial court in Cause Nos. 11-11-00343-CR and 11-11-00344-CR are affirmed.


                                                          JIM R. WRIGHT

March 14, 2013                                            CHIEF JUSTICE

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.

13