**Opinion filed August 15, 2024**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-23-00005-CR & 11-23-00006-CR

_____

## NATHAN SANDOVAL, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 244th District Court**
**Ector County, Texas**
**Trial Court Cause Nos. C-21-0663-CR & C-21-0709-CR**

## M E M O R A N D U M   O P I N I O N

A jury convicted Appellant, Nathan Sandoval, of aggravated assault with a deadly weapon, a second-degree felony, and aggravated kidnapping, a first-degree felony. *See* TEX. PENAL CODE ANN. § 20.04(b), (c) (West 2019); § 22.02(a)(2), (b) (West Supp. 2023). After Appellant pleaded "true" to two enhancement paragraphs that alleged prior felony convictions, the jury found them to be "true", and assessed his punishment at forty years' confinement in the Institutional Division of the Texas

Department of Criminal Justice (TDCJ), for each offense. *See id.* § 12.42(d) (West 2019). The trial court sentenced Appellant accordingly and ordered that the sentences run concurrently. In a single issue in each appeal, Appellant argues that the evidence was legally insufficient to support his convictions for the offenses. We affirm.

*Factual and Procedural History*

At trial, Edward Leyva, the complainant in the aggravated-assault case, testified that he knew Appellant through Edward's siblings, who had attended school with Appellant. Appellant developed a relationship with Edward's youngest sister, Abigail Leyva, the complainant in the aggravated-kidnapping case. Appellant and Abigail lived together and had a daughter. However, the relationship eventually ended, and Abigail developed a relationship with another man.

In March 2021, Edward was working as a bartender at Genghis Grill. Edward was aware that Appellant had been trying to contact Abigail. During the night of March 6 or early morning of March 7, Edward returned home from work to discover Appellant outside of Edward's apartment. Appellant inquired into Abigail's whereabouts, and Edward notified Appellant that she was not there. Appellant asked Edward if he could go inside but Edward had a "weird feeling, just like that sense of guard" about the situation and tried to stall Appellant. According to Edward, Appellant was wearing a grey zip-up hooded sweater jacket. Edward could see the imprint of a firearm in Appellant's jacket pocket. Edward explained that Appellant's hand was in the jacket pocket, pointing the firearm at Edward. Edward felt "a little threatened." When Edward reached for his cell phone to notify his girlfriend, Alexia Estrada, Appellant "told [him] to leave it in [his] pocket and not to reach for it."

Although Edward attempted to stall Appellant, he ultimately admitted Appellant into his apartment. Alexia was there, and she joined Appellant and Edward in the living room. Appellant directed the two to place their cell phones on

the table. Hearing sirens going by, Edward described Appellant as becoming paranoid and he saw Appellant remove the firearm from his pocket while looking out the door's peephole. Edward eventually convinced Appellant to leave, and he called 9-1-1. Edward explained that he was concerned for his safety and felt threatened by Appellant pointing the firearm at him. Based on his observations, Edward did not believe that the firearm used and exhibited by Appellant was a toy or was fake.

Alexia described Appellant as "[a]gitated, like he was nervous about something" during the encounter. Alexia testified that Appellant repeatedly asked about Abigail's whereabouts. Alexia also saw Appellant's firearm when he had removed it from his pocket while looking out the peephole.

The following day, Alexia was with Abigail as they went to get groceries. The two returned to Alexia's apartment and unloaded the groceries. While Alexia was inside and Abigail was outside, Alexia "heard a big bang" and Abigail screaming. Alexia testified that the noise "sounded like a gun." Alexia looked outside and saw "[Appellant] trying to get in[to] Abigail's car" on the driver's side. Alexia ran outside to get Abigail but, by the time she got to the car, Appellant was inside the car and drove off with Abigail. Alexia stated that Abigail looked terrified.

Abigail testified that she began a relationship with Appellant when she was fifteen years old and he was twenty years old. Abigail became pregnant with Appellant's daughter and dropped out of high school in the ninth grade. While their relationship did not last, Appellant maintained a relationship with their daughter. Abigail explained that Appellant's behavior changed over the course of their relationship, stating that "he used to be like loving, caring . . . and then like out of nowhere he just switched to just being conniving, so rude, so angry, so hateful just so . . . always mad and like just unhappy." Abigail also described Appellant's

3

escalating acts of violence, including choking her and pointing a firearm at his grandfather and young cousin.

Appellant began contacting Abigail about one week before the kidnapping, expressing discontent with Abigail for ending their relationship and for becoming an exotic dancer. Text messages between Appellant and Abigail in the days leading up to and following the alleged kidnapping were admitted into evidence. Several of the messages sent before the alleged kidnapping indicate that Appellant was following Abigail and was making veiled threats.

On March 8, 2021, Abigail went to Edward's apartment to retrieve clothes. Abigail was driving a silver Nissan, which she confirmed was the same car shown in the State's photographs that were taken by Odessa Police Department (OPD) crime scene technician Cynthia Gomez. After returning from grocery shopping, Abigail was sitting in her car when she saw Appellant "creeping by . . . my car" as he drove though the parking lot. Abigail moved her car into another parking spot and Appellant "parked halfway in front of [her] car." Appellant attempted to open Abigail's passenger's side door but when he could not, he moved to the driver's side door. When Appellant was unable to open the driver's side door, he "pistol whip[ped]" the window; however, the window did not break; Appellant shot the window. Appellant then crawled into Abigail's car, pointed the firearm at Abigail, prevented her from exiting, and drove Abigail's car away. Appellant left his firearm in his lap while driving. Abigail described feeling scared, believing that Appellant intended to kill her.

Abigail explained that law enforcement called Appellant after the kidnapping and tried to convince him to let Abigail go, but he was unwilling to do so. Appellant directed Abigail to tell the police that nothing was wrong, and, out of fear, she complied. Abigail was eventually able to get her phone and forward her location to her sister. Appellant subsequently obtained her phone and held onto it. Abigail

4

testified that she was eventually able to get free when Appellant noticed police vehicles patrolling in the immediate vicinity. They were standing outside of the car when—although Abigail did not know exactly what prompted Appellant—Appellant took off running and Abigail ran in a different direction. Abigail flagged down the driver of another vehicle, who drove her to Edward's apartment. Several days after the alleged kidnapping, Appellant sent Abigail a video of him wearing a "Dia de los Muertos" facemask and pointing a firearm at the camera—the video was admitted into evidence.

Jesusita Barriga, Edward's and Abigail's mother, testified that on March 8, 2021, she was watching Edward's son while Abigail and Alexia went to the grocery store. After Abigail and Alexia returned and brought the groceries in, Abigail went back outside. While Abigail was outside, Barriga heard a gunshot and Alexia ran inside the apartment saying, "[Appellant] has got [sic] Abigail." Barriga ran outside and observed Appellant driving the car with Abigail inside. Barriga described Abigail as screaming and appearing "terrified." Barriga testified that Abigail returned several hours later, scared and disheveled.

Darla Durham, who lived in the same apartment complex as Edward, testified that on March 8, 2021, she "heard what sounded like a gunshot, shattered glass falling, hitting the ground, yelling, [and] screaming." Durham saw "a lot of fighting" in a silver car after she heard the gunshot. Durham explained that, after a struggle, the man drove away.

Gomez testified that she responded to the scene of an alleged aggravated kidnapping on March 8, 2021. Upon arrival, Gomez collected a bullet casing from the ground. Photographs taken at the scene and admitted as exhibits showed a single bullet casing lying next to a pile of broken glass. Gomez acknowledged that she did not "have any way" of tying the bullet casing to Appellant and did not recover a firearm.

5

On March 9, 2021, Gomez took photographs of a silver Nissan Sentra that was recovered by OPD, which were admitted as exhibits. The photographs show a broken driver's side window, shattered glass in the driver's seat, and what appears to be a bullet hole through the passenger's side door.

OPD Detective Holly Hughes testified that she is a certified hostage negotiator and that she responded to the alleged kidnapping. Detective Hughes explained that she was able to speak with Appellant on the phone with the assistance of one of Abigail's family members. Detective Hughes attempted to build rapport with Appellant and encouraged him to drop Abigail off, but he was unwilling to do so. While speaking with Detective Hughes, Appellant denied using a firearm. Detective Hughes also briefly spoke with Abigail, who sounded "very upset" and who stated, "that everything was fine." A recording of the conversation was admitted as an exhibit.

<em>Sufficiency of the Evidence</em>

A. *Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Brooks*, 323 S.W.3d at 895; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v.*

*State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As such, we must defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. The *Jackson* standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we determine whether the necessary inferences are based on the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clement v. State*, 248 S.W.3d 791, 796 (Tex. App.—Fort Worth 2008, no pet.). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

The evidence need not directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the defendant's conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we treat direct and circumstantial evidence equally, and we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v.*

*State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

B. *Applicable Law*

As relevant here, a person commits aggravated assault if he "intentionally or knowingly threatens another with imminent bodily injury" and "uses or exhibits a deadly weapon during the commission of the assault." PENAL §§ 22.01(a)(2), 22.02(a)(2). "[T]hreats can be conveyed in more ways than in a verbal manner; a threat may be communicated by acts, words, or conduct." *Knight v. State*, 406 S.W.3d 578, 587 (Tex. App.—Eastland 2013, pet. ref'd) (citing *McGowan v. State*, 664 S.W.2d 355, 357 (Tex. Crim. App. 1984)).

A person commits aggravated kidnapping if he "intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense." PENAL § 20.04(b). To "abduct" a person "means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2).

While a firearm is a deadly weapon per se, generally, mere possession of a firearm is not enough to support aggravated assault with a deadly weapon; instead, "[t]he deadly weapon must, in some manner, help facilitate the commission of the felony." *Plummer v. State*, 410 S.W.3d 855, 865 (Tex. Crim. App. 2013); *see* PENAL § 1.07(a)(17)(A). In this regard, "[t]he act of pointing a loaded [firearm] at someone, by itself, is threatening conduct that supports a conviction for aggravated assault." *Mitchell v. State*, 546 S.W.3d 780, 786 (Tex. App.—Houston [1st Dist.] 2018, no pet.). To "use" a deadly weapon means to utilize, employ, or apply the weapon to achieve its intended result: "the commission of a felony offense or during immediate flight therefrom." *Safian v. State*, 543 S.W.3d 216, 223 (Tex. Crim. App. 2018) (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989)). In

8

contrast, to "exhibit" a deadly weapon only requires that the actor showed, displayed, or presented the weapon during the commission of a felony offense or during the immediate flight therefrom. *Id.* "Using" a deadly weapon during the commission of a felony offense extends to employing the deadly weapon, including simply possessing it, in such a manner that facilitates the associated felony. *Id.* at 223–24. Under these definitions, one can "use" a deadly weapon without exhibiting it. *Id.* at 224.

C. *Analysis*

1. *Aggravated Assault with a Deadly Weapon*

Appellant challenges the sufficiency of the evidence supporting his conviction for aggravated assault with a deadly weapon on two grounds: (1) "there was insufficient evidence that he used or exhibited a firearm"; and (2) "there was no evidence adduced at trial that [Appellant] ever threatened Edward."

Appellant's contention that there was insufficient evidence that he "used or exhibited" a firearm is grounded in Edward's and Alexia's alleged failure to provide specific testimony describing the firearm that Appellant possessed, and the fact that the firearm was not recovered by law enforcement. Law enforcement is not required to recover the alleged firearm or present it as evidence and a complainant does not need to describe the firearm with specificity to support a conviction. *See Gomez v. State*, 685 S.W.2d 333, 336 (Tex. Crim. App. 1985) ("[I]f a weapon is not recovered, corroboration of the complainant's description of the weapon in the form of expert testimony is not required."); *Riddick v. State*, 624 S.W.2d 709, 711 (Tex. App.— Houston [14th Dist.] 1981, no pet.) ("Where the witness has positively identified the weapon as a pistol, we do not believe . . . that it is required that she have seen the trigger, handle or cylinder or other indicia of a [firearm] in order to support the conviction of the use of a deadly weapon."); *see also Bowers v. State*, No. 11-17-00257-CR, 2019 WL 4509715, at *2 (Tex. App.—Eastland Sept. 19, 2019, no pet.)

9

(mem. op., not designated for publication). Here, Edward was able to identify the firearm through Appellant's jacket pocket and actually saw the firearm when Appellant removed it while looking through the peephole of the door. *See Riddick*, 624 S.W.2d at 711. The firearm was also identified by Alexia when Appellant removed it from his jacket pocket. Moreover, although Appellant argues that the witnesses could not "testify to characteristics of the alleged firearm [or] . . . to the manufacturer, model, or specific appearance of the [firearm]," they were not asked or required to do so. *See id.*

Appellant next argues that there was no evidence of a threat because Edward did not testify that Appellant threatened to shoot or otherwise physically harm him, Alexia, or their child or that Appellant "brandished the weapon at Edward or Alexia." However, importantly, a threat does not need to be conveyed verbally; certain conduct may support the element of threatening one with serious bodily injury. *See Knight*, 406 S.W.3d at 587. Edward testified that Appellant pointed the firearm at him through Appellant's jacket pocket, that he could see the outline of a firearm, that he knew it to be a firearm, and that he felt threatened and feared for his safety. *See Mitchell*, 546 S.W.3d at 786 (holding that the act of pointing a loaded firearm is sufficient to support a conviction of aggravated assault); *see also Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002) (noting that it is "not significant" whether a deadly weapon is loaded or unloaded during the commission of the offense); *Ogren v. State*, 447 S.W.2d 682, 683 (Tex. Crim. App. 1969) ("When a pistol is used in an assault but not used or attempted to be used as a bludgeon, the presumption is that it was loaded, in the absence of proof to the contrary.").

Moreover, Appellant's actions of controlling Edward and Alexia by requiring them to place their cell phones on the table to prevent them from calling law enforcement, coupled with his paranoid behavior at the sound of sirens passing by, support an inference that Appellant understood that he was threatening the use of the

10

firearm against Edward through his actions. *See Jackson*, 443 U.S. at 319 (permitting jurors to draw inferences from basic facts); *Villa*, 514 S.W.3d at 232 (directing us to consider "the cumulative force of all the evidence"); *Mitchell*, 546 S.W.3d at 786. Accordingly, we conclude that there was sufficient evidence to support the jury's conclusion that Appellant threatened Edward with imminent bodily harm with a deadly weapon: a firearm. *See Safian*, 543 S.W.3d at 224 (noting that a deadly weapon may be used without being exhibited); *see also Malone v. State*, No. 05-02-01206-CR, 2003 WL 22072689, at *3–4 (Tex. App.—Dallas Sept. 8, 2003, no pet.) (not designated for publication) (affirming conviction for aggravated robbery where Appellant pointed a firearm at store clerk, who testified they recognized the weapon as a firearm, and no weapon was recovered).

### 2. *Aggravated Kidnapping*

As to his conviction for aggravated kidnapping, Appellant only challenges the sufficiency of the evidence supporting a finding that he used or exhibited a deadly weapon. Like his challenge to the aggravated-assault conviction, Appellant argues that the evidence was insufficient to support aggravated kidnapping because Abigail was not able to describe the firearm used and law enforcement did not recover it. As noted, law enforcement is not required to recover the firearm and a witness does not need to describe the firearm in detail to support a conviction. *See Gomez*, 685 S.W.2d at 336; *Riddick*, 624 S.W.2d at 711. At trial, several witnesses described hearing a gunshot, Abigail specifically testified that Appellant shot her window out in order to gain access to her car, a bullet casing was found with the broken glass at the scene of the kidnapping, and the car had what appeared to be a bullet hole in the passenger's side door. *See Carrizales*, 414 S.W.3d at 742 (noting that "circumstantial evidence is as probative as direct evidence"). Accordingly, we conclude there was sufficient evidence to support the jury's conclusion that

11

Appellant used or exhibited a firearm during the commission of the kidnapping offense.  *See Safian*, 543 S.W.3d at 223.

Appellant's sole issue in each appeal is overruled.

*This Court's Ruling*

We affirm the judgments of the trial court.


W. BRUCE WILLIAMS

JUSTICE


August 15, 2024

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.