**Opinion filed March 31, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00092-CR

_____

## DANIEL ARAGON MACHADO, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 27117A**

### M E M O R A N D U M   O P I N I O N

The jury convicted Daniel Aragon Machado of evading detention with a motor vehicle.  *See* TEX. PENAL CODE ANN. § 38.04(b)(2)(A) (West 2016).  After Appellant pleaded "true" to an enhancement allegation for a prior felony offense, the jury assessed his punishment at confinement for fifteen years in the Institutional Division of the Texas Department of Criminal Justice.

Appellant brings two issues on appeal.  First, Appellant asserts that the evidence was legally insufficient to establish that he was guilty of evading detention.

Second, Appellant argues that he was egregiously harmed by the trial court's failure to include a jury instruction in the punishment charge that extraneous offenses must be proven beyond a reasonable doubt in order for the jury to consider them in assessing punishment. We modify and affirm.

*Background Facts*

Around midnight on September 9, 2016, Officer Catherine Eberhardt was patrolling the streets of Abilene in a marked police vehicle. Officer Eberhardt observed Appellant run a red light on a motorcycle at the intersection of North 1st and Grape. Officer Eberhardt activated the emergency lights on the police vehicle and utilized the siren to clear the intersection in pursuit of Appellant. Officer Eberhardt caught up to the motorcycle at the intersection of North 1st and Graham.

As Officer Eberhardt approached the intersection, Appellant was stopped in the left-hand lane with another vehicle in the right-hand lane waiting for the light to turn green. Appellant cut in front of the other vehicle and began traveling northbound on Graham. Officer Eberhardt reactivated her siren and continued to pursue Appellant. Appellant then rolled through a stop sign at the intersection of Graham and North 3rd and turned west onto North 3rd. Appellant then went north onto Kirkwood, west onto North 5th, north onto Park where he ran a stop sign at North 6th and Park, south onto Westmoreland, and then east onto North 5th where he came to a stop at his house at 501 Westmoreland.

Officer Eberhardt had to accelerate in excess of fifty miles per hour at one point, eventually making contact with Appellant at his home. She testified that Appellant quickly dismounted the motorcycle, at which point she displayed her TASER so that he would not try to escape on foot. She then placed him into custody. Appellant gave numerous reasons for his failure to stop immediately, some of which contradicted one another. Appellant claimed that he was trying to get out of

2

Officer Eberhardt's way, that he thought she was responding to another call, that he did not know he was the one being pursued, and that he was just trying to get home. Officer Eberhardt believed Appellant may have discarded something along the route, but a search of the area by other officers returned no discarded contraband.

Officer Eberhardt conducted a field sobriety test on Appellant, ultimately excluding intoxication and admitting that Appellant appeared to be telling the truth about only having had one beer two hours prior. Officer Eberhardt conceded that, if Appellant truly wanted to escape from her, he could have gone to the highway, opened the throttle, and disappeared.

Appellant testified that he had been at an ex-girlfriend's house prior to these events and had picked up some beer on his way home. Appellant stated that he did not notice Officer Eberhardt behind him until he was stopped at the intersection of North 1st and Graham. Appellant believed he was impeding the path of an emergency vehicle, and he testified that he asked the motorist next to him, whose window was down, if he could turn in front of her in an effort to get out of the way. This maneuver was a right turn from the left-hand lane in front of a vehicle legally in the right-hand turn lane, an illegal maneuver regardless of whether another driver gave Appellant permission to do so. Appellant proceeded on this route heading toward his house. He testified that, due to the wind noise on his motorcycle, it was not easy to hear things behind him.

Appellant stated that, as he turned onto North 3rd, he realized the officer was still following him. Ahead of Appellant were reflections of flashing police vehicle lights pulsating off neighborhood homes and objects. Appellant assumed that the officer behind him was responding to the location of other officers. Appellant testified that he turned toward the other flashing lights out of curiosity and did not realize that he was the one being pursued until he had already passed the other officers. Appellant testified that, at this point, he was near his house and that he

3

needed to get home because his girlfriend was on her way over and did not have a key to his house.

Appellant admitted to running stop signs, contending that it was a bad habit of motorcyclists in an effort to not put their feet down. Appellant understood why Officer Eberhardt could have believed that he was trying to evade her, but Appellant insisted that he was not attempting to do so. Appellant claims that, if he had truly been trying to escape, he would have taken off toward the interstate or turned down a narrow alleyway. Appellant adamantly denied having ditched any contraband on his route home. Appellant also claimed that it was difficult for him to see the officer behind him because his custom chopper did not have a rearview mirror. Appellant testified that he was just trying to make it home.

After hearing testimony, argument, and reviewing the evidence, including the recorded dashcam video of the pursuit and stop, the jury found Appellant guilty of evading detention with a motor vehicle. The punishment phase of the trial began immediately thereafter. The State sought to enhance Appellant's punishment based on Appellant's prior felony conviction for forgery. Appellant pleaded "true" to the enhancement allegation.

*Issue One*

In Appellant's first issue, he asserts that the State presented insufficient evidence to support a conviction for the offense of evading detention with a motor vehicle. We disagree.

*Standard of Review*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all

of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As such, we defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. The *Jackson* standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

*Analysis*

"A person commits an offense if he intentionally flees from a person he knows is a peace officer or federal special investigator attempting lawfully to arrest or detain him." PENAL § 38.04(a). An offense under Section 38.04 is a Class A misdemeanor, except that the offense is a felony of the third degree if the actor uses a vehicle while the actor is in flight. *Id.* § 38.04(b)(2)(A).

5

Appellant contends that the evidence was insufficient to prove beyond a reasonable doubt that Appellant intentionally fled from Officer Eberhardt. Appellant argues that, because the pursuit did not involve high speeds, because he did not utilize his motorcycle's full abilities, because he turned toward other police cars, because he led Officer Eberhardt to his home, and because he had no reason for actually trying to evade Officer Eberhardt, combined with the rational and corroborated explanations of the route he took, the jury, even with minimal evidence to support evading, could not have found him guilty based on all of the evidence. We disagree.

Fleeing is "anything less than prompt compliance with an officer's direction to stop." *Horne v. State*, 228 S.W.3d 442, 446 (Tex. App.—Texarkana 2007, no pet.). Moreover, the statute does not require high-speed fleeing, or even effectual fleeing. *Mayfield v. State*, 219 S.W.3d 538, 541 (Tex. App.—Texarkana 2007, no pet.). Thus, "fleeing slowly is still fleeing." *Id.*

Here, Officer Eberhardt testified that she observed Appellant fail to stop at a red light, which is a violation of traffic laws. *See* TEX. TRANSP. CODE ANN. § 544.007(d) (West Supp. 2020). Appellant ultimately ran two red lights and two stop signs, turned in front of a vehicle stopped at one of those red lights, and traveled at a speed high enough to cause Officer Eberhardt to lose sight of him, all while a marked black and white police vehicle with activated emergency lights and siren followed him.

Appellant asserts that, until Officer Eberhardt caught up to him at the light at the intersection of North 1st and Graham, he could not have known that he was being pursued. Therefore, Appellant argues that it would be irrational to conclude that he believed she was pulling him over when he turned in front of the vehicle stopped at the intersection. Assuming without finding that Appellant did not perceive that the patrol officer was attempting to stop him at North 1st and Graham, the events that

6

transpired after he cut in front of the vehicle at that intersection do not support Appellant's contention that the evidence presented was insufficient. In conjunction with Appellant's first issue, disputing the legal sufficiency of the evidence, this court reviewed State's Exhibit No. 1.

State's Exhibit No. 1 is a police dashcam video of the pursuit and stop of Appellant. After a momentary but distanced initial pursuit by Officer Eberhardt, the video shows the police vehicle, with emergency lights on, approaching from a position immediately behind Appellant. Appellant was stopped in the left-hand lane at the stop light at the intersection of North 1st and Graham. A reasonable jury was free to conclude that a driver, including Appellant, should have been alerted that the police vehicle was signaling. Indeed, Appellant admits that this is the point at which he first realized Officer Eberhardt was behind him. When Appellant then began a right turn from the left-hand lane, turning in front of a vehicle in the right lane also stopped at the light, the officer immediately hit her siren. At that point, a reasonable jury could have concluded that a driver should have little doubt that the police vehicle was signaling him. Instead of pulling over to the right and stopping, Appellant, with the police vehicle directly behind and siren and lights signaling, then proceeded to take what a jury could have concluded was an unnecessarily winding route of seven turns—turning every block or two through a residential neighborhood, running stop signs as he went. Appellant wore no helmet, so the perception of a siren and flashing lights at night, immediately behind him and reflecting off neighborhood objects, would presumably not be blocked. Appellant's speed, while not excessive, was quick in combination with the constant turns taken. When finally stopped and detained by the officer, Appellant said that he was "just [going] home." However, a reasonable jury was free to conclude that this did not appear to have been a direct or effective route to that location, and the jury could have reasonably concluded that Appellant knew that the officer was attempting to stop his vehicle.

7

*See Mayfield*, 219 S.W.3d at 540–41. When viewed in the light most favorable to the verdict, State's Exhibit No. 1 by itself provides legally sufficient evidence to support a jury's finding that Appellant attempted to evade detention. Combining State's Exhibit No. 1 with the testimony of Officer Eberhardt and the admissions of Appellant, the evidence is legally sufficient to support the jury's verdict as to the guilt of Appellant for evading detention under Section 38.04(b)(2)(A) of the Texas Penal Code.

Although Appellant claimed to have had good reasons for failing to stop, the jury, in viewing the recorded dashcam video and hearing the dialog therein, was free to wholly reject Appellant's explanations and accept the testimony of Officer Eberhardt. *See Jackson*, 443 U.S. at 326; *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Likewise, the jury was entitled to make reasonable inferences from the evidence presented. *See Jackson*, 443 U.S. at 326; *Brooks*, 323 S.W.3d at 899. The trier of fact, therefore, was justified in finding beyond a reasonable doubt that Appellant knew that a peace officer was attempting to detain him, that he intentionally fled from that detention, and that he used a motor vehicle in doing so. *See Brown v. State*, 498 S.W.3d 666, 672 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). We overrule Appellant's first issue.

### *Issue Two*

In his second issue, Appellant argues that the trial court committed reversible error when it did not sua sponte instruct the jury that, before it could consider the extraneous-offense evidence during the punishment phase, the jury must find that the State had proved those offenses beyond a reasonable doubt. Here, there were two unadjudicated extraneous offenses, with questions of fact as to the level of Appellant's involvement, requiring an instruction that, in order for those offenses to be considered in assessing punishment, the State must have proven Appellant guilty of those extraneous offenses beyond a reasonable doubt. We agree that the trial

court's failure to include the instruction was error; however, we do not find it to be reversible error. In so doing, we do not suggest that courts can blindly or intentionally ignore their responsibility to advise the jury of its duty with regard to consideration of extraneous offenses during the punishment phase of the trial. We merely find that, based on this record and for the reasons stated below, the failure to instruct the jury did not rise to the level of reversible error.

*Standard of Review*

Article 36.14 of the Texas Code of Criminal Procedure provides in part that the trial court shall include in the jury charge "the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007); *see Huizar v. State*, 12 S.W.3d 479, 483 (Tex. Crim. App. 2000). Article 37.07, section 3(a)(1) provides in relevant part:

> [E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to . . . evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible.

CRIM. PROC. art. 37.07, § 3(a)(1) (West Supp. 2020).

The plain language of Article 37.07, section 3(a)(1) requires that evidence of extraneous crimes or bad acts "may not be considered in assessing punishment until the fact-finder is satisfied beyond a reasonable doubt that [the extraneous bad acts and offenses] are attributable to the defendant." *Huizar*, 12 S.W.3d at 481 (alteration in original) (quoting *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999)); *see* CRIM. PROC. art. 37.07, § 3(a)(1). It is well settled that, if extraneous-offense evidence is offered during the trial's punishment phase, the trial court must sua sponte provide a reasonable-doubt instruction. *Brown v. State*, 243 S.W.3d 141, 151 (Tex. App.—Eastland 2007, pet. ref'd) (citing *Huizar*, 12 S.W.3d at 484–85). Therefore, we hold that the trial court erred when it did not include the extraneous-offense instruction in its charge to the jury.

9

If the appellant failed to object to the jury-charge error, as here, we reverse only if the appellant suffered "egregious harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Appellant made no objection to the proposed jury charge. Thus, we must determine whether the error was "so egregious and created such harm" that Appellant was deprived of "a fair and impartial trial." *Id.* "Egregious harm is a difficult standard to prove and such a determination must be done on a case-by-case basis." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). We do not consider theoretical harm to Appellant by the admission of the extraneous-offense evidence; rather, we consider the "impact of the omission in the jury charge of a reasonable-doubt instruction." *Ellison v. State*, 86 S.W.3d 226, 228 (Tex. Crim. App. 2002). Jury-charge error is egregiously harmful if "it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Martinez v. State*, 313 S.W.3d 358, 367 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)).

Egregious harm is determined by a review of:

- The jury charge as a whole;
- The state of the evidence, including contested issues and the weight of probative evidence;
- Trial arguments of counsel; and
- Any other relevant information when viewing the record as a whole.

*Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006); *Almanza*, 686 S.W.2d at 171. An additional part of our assessment includes whether evidence of the extraneous offense was clear, strong, direct, and unimpeached. *Martinez*, 313 S.W.3d at 367.

> Texas courts have concluded that egregious harm has not been
> shown because of the omission of a reasonable-doubt instruction

10

when: (1) the defendant did not challenge the sufficiency of the evidence connecting him to the extraneous conduct at trial and/or on appeal, *see McClenton v. State*, 167 S.W.3d 86, 98 (Tex. App.—Waco 2005, no pet.); *Bolden v. State*, 73 S.W.3d 428, 432 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *Arnold v. State*, 7 S.W.3d 832, 835 (Tex. App.—Eastland 1999, pet. ref'd); (2) the evidence connecting the defendant to the extraneous conduct is "clear-cut," *see Allen v. State*, 47 S.W.3d 47, 52–53 (Tex. App.—Fort Worth 2001, pet. ref'd); and (3) the punishment assessed is at the low end or in the middle of the available punishment range and/or significantly less than sought by the prosecution, *see Tabor v. State*, 88 S.W.3d 783, 789 (Tex. App.—Tyler 2002, no pet.); *Bolden*, 73 S.W.3d at 432; *Allen*, 47 S.W.3d at 53; *Arnold*, 7 S.W.3d at 835.

*Johnson v. State*, 181 S.W.3d 760, 766 (Tex. App.—Waco 2005, pet. ref'd). Therefore, we must analyze each of these factors as they apply to this case.

*Analysis*

At trial, the State introduced evidence of certain prior offenses and bad acts committed by Appellant. Reference to Appellant's crimes and bad acts was made under the authority of Article 37.07, section 3(a)(1). These other crimes and bad acts included Appellant's prior conviction for forgery—to which he pleaded "true"; a conviction for driving while intoxicated with child passenger; and Appellant's involvement in an "outlaw" motorcycle gang—the Bandidos.

The judgment against Appellant for his prior felony conviction for forgery was introduced into evidence. Appellant testified that he had been convicted of the state jail felony offense of driving while intoxicated with a child passenger. Officer Jeremiah Torrez testified during the punishment phase of Appellant's trial that Appellant had admitted being a member of the Bandidos. Appellant's defense witness Caleb Preznal testified and admitted that he knew Appellant to be a member of the Bandidos. Similarly, Robert Allen Stephens, Appellant's other defense witness, testified during the punishment phase that Appellant was a member of the Bandidos. Aside from a motion in limine that was overruled, Appellant did not

11

contest the fact that he was a member of the Bandidos and did not dispute the two prior felony convictions.

As for the two prior convictions, when an offense has been adjudicated, a beyond-a-reasonable-doubt instruction in the punishment charge is not necessary. *See Bluitt v. State*, 137 S.W.3d 51, 54 (Tex. Crim. App. 2004). Additionally, "[a]s a general matter, testimony regarding a defendant's affiliation with a gang may be relevant and admissible at the punishment phase to show the defendant's character." *Mitchell v. State*, 546 S.W.3d 780, 789 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (quoting *Garcia v. State*, 239 S.W.3d 862, 866–67 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd)). Therefore, no error was committed by the trial court's admission of the evidence of the two adjudicated prior felonies or the evidence of Appellant's membership in the Bandidos motorcycle gang.

The State also produced witnesses who testified as to Appellant's alleged involvement in two unadjudicated offenses. These offenses included the stabbing of Roy Martinez Jr. and the robbery and assault of Van West Robinson. Unadjudicated extraneous offenses cannot be considered by the factfinder during the punishment phase unless the State proves beyond a reasonable doubt that the acts or offenses are attributable to the defendant. CRIM. PROC. art. 37.07, § (3)(a)(1); *see Huizar*, 12 S.W.3d at 484.

On the night of September 30, 2016, only three weeks after Appellant's arrest for evading detention, Jamie Dickerson and her boyfriend, Roy Martinez Jr., went to the Western Edge bar. Shortly after they arrived, Cherokee Miller confronted Dickerson about knowing Miller's boyfriend. Miller and Dickerson began to fight, and Martinez stepped in to try and break up the two women. As Martinez went to break up the fight, he noticed Jacob Garcia and Appellant approach him from behind. Garcia began punching and stabbing Martinez from the front and left side, while Appellant assaulted Garcia from behind. When Dickerson got up from the fight, she

saw Garcia and Appellant standing over Martinez who had been stabbed eleven times in the neck, head, side, arm, back, and abdomen. Dickerson testified that she noticed a knife in Garcia's hand, but not one in Appellant's hand. Martinez stated the same: that he saw a knife in Garcia's hand, but not one in Appellant's. Dickerson testified that she saw Appellant striking Martinez in the back of the head, and she speculated that a knife could have been concealed. Garcia was sentenced to forty-five years for the stabbing.

On July 25, 2018, Officer Jerod Daniel responded to a robbery where three assailants had beaten and robbed Van West Robinson. Robinson testified that he was a member of the Kinfolk motorcycle club and that he had driven his motorcycle past the Bandidos' clubhouse wearing his Kinfolk "cut," a leather vest worn by members of motorcycle clubs. As he passed the clubhouse, he saw numerous people jump on their motorcycles and begin to chase him. Three individuals on motorcycles caught up to him and attempted to kick him off his motorcycle. The three men ultimately cut him off and forced him to stop in a parking lot. Robinson testified that he pulled out a pistol but never pointed it at any of the three men. After words were exchanged between Robinson and the three men, Robinson was instructed to leave, agreed to do so, holstered his gun, and got back on his motorcycle. Robinson testified that, as he attempted to leave, Jessie Trevino charged him and threw him on the ground and that all three men then commenced to kicking and beating him. Robinson claims that they then stole his vest, which he referred to as his "cut," as well as his personal cell phone and a pistol. Robinson testified that he could not see who was doing what but that he was being attacked by more than one person.

Officer Daniel arrived a short time later and began his investigation to determine who had attacked Robinson. Robinson described his attackers as rival gang members, one of whom he was able to specifically name as Trevino. When Officer Daniel attempted to learn the name of the other assailants, Robinson

generally described Appellant's physical characteristics. Officer Daniel had encountered Appellant on previous occasions, recognized his description as given by Robinson, and showed Robinson a Taylor County website booking photo of Appellant. Robinson immediately exclaimed that the individual in the photo, Appellant, was one of the three individuals who had beaten and robbed him. Robinson testified that he had been around Appellant numerous times before but could not remember his real name, only his road name, "Rock."

The punishment charge submitted to the jury did not include a reasonable-doubt instruction, which would operate to prevent the jury from considering evidence of extraneous offenses unless the jury was satisfied that the State had proven the defendant's involvement beyond a reasonable doubt. We do note, however, that the jury charge submitted during the guilt/innocence phase of trial included a proper reasonable-doubt instruction relating to evidence of other offenses. A correct instruction in the guilt/innocence phase weighs against the finding of egregious harm. *Zarco v. State*, 210 S.W.3d 816, 819–20 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see also McClenton*, 167 S.W.3d at 97. Further, looking at the argument of counsel per *Sanchez*, the record reveals that the State discussed its burden of proof five times in voir dire and that Appellant's trial counsel did so four times. While this voir dire argument did not specifically refer to the punishment phase of trial, it did not exclude it either. Closing arguments of both parties also discussed the State's burden of proof, although not specifically as to extraneous evidence. Appellant argues that the trial court's failure to sua sponte include this instruction in the jury charge at the punishment phase of trial constitutes reversible error. As noted above, Appellant did not object to the omission of this instruction; therefore, even though the trial court's failure to include it does constitute error, the error is only reversible if it amounts to "egregious harm." *See Almanza*, 686 S.W.2d at 171.

We conduct our egregious-harm analysis viewing the entire record and applying the *Johnson* test outlined above. 181 S.W.3d at 766. First and foremost, Appellant does not challenge the sufficiency of the evidence connecting him to the extraneous conduct. *See id.* While Appellant's trial counsel did cross-examine the State's witnesses who testified concerning the unadjudicated extraneous offenses, Appellant admits in his brief to this court that "[t]he evidence as to the extraneous offenses was sufficient."

The State's proof tying Appellant to the extraneous offenses and bad acts also diminishes the harm Appellant suffered by failing to receive an instruction to the jury that it should not consider such evidence unless it attributed such extraneous offenses and bad acts to Appellant beyond a reasonable doubt. There is sufficient evidence linking Appellant to the crimes alleged—though there were fact questions surrounding his level of participation in those extraneous offenses. Dickerson identified Appellant as the person whom she saw approach Martinez and strike him in the back of the head. While Appellant's trial counsel did cross-examine Dickerson and elicit testimony that she did not see a knife in Appellant's hand at the time, Dickerson still identified Appellant as one of the individuals involved in the stabbing of Martinez. Appellant provided no rebuttal witnesses or other evidence to contradict Dickerson's assertion that Appellant struck Martinez from behind on the night of Martinez's stabbing.

Additionally, Martinez identified Appellant as one of the two individuals who approached him from behind as he tried to break up the fight between Dickerson and Miller. Martinez testified that Garcia stepped in front of Martinez and began stabbing him, while Martinez felt Appellant punch him from behind, later learning that he was also stabbed from behind. Martinez testified that Appellant was the only one who could have caused the stab wounds to his head and neck. Appellant's trial counsel cross-examined Martinez and elicited testimony that Martinez never saw a

15

knife in Appellant's hand. However, Appellant provided no rebuttal witnesses, nor did he provide any evidence to the contrary to suggest that he was not involved in the assault of Martinez that night.

As to the alleged assault and robbery of Robinson, Robinson testified that Appellant was one of three men who chased him down, cornered him in a parking lot, and then assaulted and robbed him. Robinson testified that, at the time, he did not know Appellant's real name but knew him by his road name, "Rock." Robinson testified that, after attempting to knock him off his motorcycle, Appellant and two other men assaulted him and stole his vest, cell phone, and a pistol. Robinson testified that he did not know which of the three men was attacking him from which direction but that he was receiving punches and kicks "from everywhere." Appellant cross-examined Robinson, asserting a theory that Robinson was the aggressor, not the victim, but Appellant did not, through his cross-examination, contest that Appellant was involved in the altercation.

Officer Daniel testified that, upon arriving at the scene where Robinson was attacked, Robinson identified Trevino as one of his assailants. Officer Daniel attempted to determine the names of the other two men. Officer Daniel testified that Robinson physically described another of his assailants as "a large male who appeared to be African American." Officer Daniel had had previous encounters with Appellant and believed Robinson to be describing Appellant's physical characteristics. He then looked up a photo of Appellant from one of his previous arrests and showed the photo to Robinson. Robinson immediately exclaimed that "that was him, meaning that [Appellant] was the second person he had described in the assault." Appellant cross-examined Officer Daniel regarding his method of showing Robinson the photograph of Appellant in an effort to identify the individuals who assaulted Robinson. However, Appellant provided no rebuttal

16

witnesses or evidence to rebut the State's assertion that Appellant was involved in the attack of Robinson.

Appellant's only witnesses, who testified as to his character, were Preznal and Stephens. Both testified during the punishment phase of Appellant's trial. Preznal testified that he knew Appellant through the motorcycle community and stated that Appellant was an asset to the Santa Saddle Bag, a charitable event run by the spiritually based motorcycle club Sinners and Saints. Preznal further testified that he did not know Appellant to be someone that goes around beating people and that Appellant has always been a good friend to him. Stephens testified similarly, stating that he knew Appellant through the motorcycle community and knew Appellant to be someone who always helped others and was a respectful person who never acted in accordance with the crimes of which he was being accused. However, neither of these witnesses were present during either of the alleged extraneous offenses and, therefore, could not provide direct testimony refuting the State's claims that Appellant was involved in the stabbing of Martinez and the assault and robbery of Robinson.

The testimony by Dickerson, Martinez, Robinson, and Officer Daniel tends to show that Appellant was involved in the stabbing of Martinez and the assault and robbery of Robinson. When clear-cut evidence credits Appellant for significant roles in these offenses and bad acts, it is difficult to ascribe "egregious harm" to the trial court's failure to instruct the jury not to consider evidence of these extraneous offenses and bad acts in assessing punishment unless the jury found beyond a reasonable doubt that Appellant committed such extraneous offenses or bad acts. *See Allen*, 47 S.W.3d at 53. The harm analysis would be more difficult if the record as a whole did not so clearly demonstrate Appellant's participation in the extraneous offenses and bad acts introduced into evidence and argued at punishment by the State. *See id.*

17

Lastly, the punishment assessed by the jury is below that which the State requested and the maximum sentence allowed by law. *See Johnson*, 181 S.W.3d at 766 ("Texas courts have concluded that egregious harm has not been shown because of the omission of a reasonable doubt instruction when . . . the punishment assessed is at the low end or in the middle of the available punishment range and/or significantly less than sought by the prosecution." (citations omitted)); *Tabor*, 88 S.W.3d at 789. Here, although the State asked the jury to start its punishment analysis at the maximum punishment of twenty years, the jury only assessed Appellant's punishment at fifteen years and did not impose a fine. *Cf.* PENAL § 12.33 (West 2019).

Based on our analysis of the record, we find that the trial court's error did not cause egregious harm. We therefore overrule Appellant's second issue.

Finally, we note that the judgment incorrectly reflects that Appellant pleaded guilty to evading detention. An appellate court has the power to modify the trial court's judgment to make the judgment speak the truth when it has the necessary information before it to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Because the record reflects that Appellant pleaded not guilty to evading detention, we modify the judgment of the trial court to reflect that Appellant pleaded "NOT GUILTY."

We also note that the judgment of the trial court erroneously reflects "N/A" with respect to the enhancement pleas and findings. The record reflects that Appellant pleaded "true" to the enhancement allegation based on his prior felony conviction for forgery and that the jury found the enhancement allegation to be true. Therefore, we modify the judgment of the trial court to reflect that Appellant pleaded "TRUE" to the first enhancement paragraph and that the jury found the enhancement paragraph to be "TRUE."

*This Court's Ruling*

As modified, the judgment of the trial court is affirmed.

W. BRUCE WILLIAMS

JUSTICE

March 31, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.