Jennifer Caughey, Justice *782 A jury convicted appellant Cardero Alexander Mitchell of aggravated assault of police officer N. Shike, a first-degree felony, and sentenced him to 50 years' imprisonment. TEX. PENAL CODE §§ 22.01 ; 22.02. In two issues, Mitchell asserts that (1) the evidence was insufficient to support his conviction, and (2) the trial court erred in admitting expert testimony during the punishment phase regarding his gang involvement. We affirm.
Background
Mitchell was charged with aggravated assault of a police officer. After a trial at which numerous witnesses testified, the jury convicted Mitchell. Because Mitchell raises a sufficiency of the evidence challenge, we detail the trial evidence.
A. Guilt-innocence phase
Three officers testified: Deputy Shike, Deputy Rangel, and Lieutenant Zitzman.
Deputy Shike. Deputy Shike offered the following testimony. On January 1, 2016, he was dispatched to the Huntington Apartments after two calls for service, a 911 hang-up call, and a call reporting a domestic disturbance with a weapon.[1] When he arrived, Deputy Shike saw the 911 caller, Corey Jones. Jones directed Deputy Shike to the apartment where the disturbance had occurred. Deputy Shike notified dispatch that weapons were possibly involved and called for back-up units.
Deputy J. Rangel and Lieutenant J. Zitzman arrived, and the officers noticed two women exiting the scene of the disturbance. The officers called the women over to the patrol car and identified one of them, Angelica Mitchell, Mitchell's sister. Angelica informed the officers that Mitchell was inside and that he had a gun.[2]
Deputy Shike and Deputy Rangel entered through the front door while Lieutenant Zitzman remained outside. Deputy Shike announced himself and continued to identify himself several times as he went upstairs. When he reached the top of the stairs, he saw Mitchell leaning out of a bedroom window. He did not see any weapons on Mitchell at that time. Deputy Shike called Mitchell over, but Mitchell jumped out of the window. Deputy Shike notified dispatch and any other officers around that Mitchell had jumped out of the window. Deputy Shike then ran downstairs, out the front door, and back to the parking lot.
Deputy Shike watched as Lieutenant Zitzman attempted to tackle Mitchell but was unsuccessful. Deputy Rangel assisted Lieutenant Zitzman in trying to detain Mitchell. Deputy Shike ran over to assist, too. Deputy Shike explained that he stood behind Mitchell trying to control his arms and get him on the ground, yelling that Mitchell should stop resisting. Mitchell then escalated the situation by trying to take Lieutenant Zitzman's gun. Mitchell was unsuccessful in that attempt. But soon thereafter, Mitchell grabbed Deputy Rangel's gun from his holster. The officers then got him down on the ground.
*783 According to Deputy Shike, Mitchell had the gun in his hands with full custody and control of it, and Deputy Shike was in fear of imminent danger of bodily injury or death for himself, his fellow officers, and several people who were nearby. Mitchell put the gun underneath his body. Deputy Shike then saw Deputy Rangel press the magazine release on the gun, release the magazine, and throw it to the side. This took away Mitchell's ability to shoot the gun 14 to 16 times, but there was still one bullet in the chamber. Deputy Shike used his knee, closed fist strikes, and a taser to try to get Mitchell to release the weapon, but Mitchell did not comply.
Mitchell fired the remaining shot. Deputy Shike initially thought he or one of his fellow officers might have been hit. He was also worried for the safety of others nearby.
Even after firing the gun, Mitchell refused to submit to commands. Deputy Shike watched Mitchell attempt again and again to shoot the gun, which was pointed in the general direction of the officers. Deputy Shike managed to get the gun away from Mitchell, and then Mitchell attempted to flee on foot again. Deputy Shike testified that he was scared that Mitchell would attempt to take another officer's gun. The officers wrestled with Mitchell to get him back down on the ground, and Deputy Shike put all of his body weight on top of Mitchell to detain him.
Additional units and emergency medical services arrived, and the officers ultimately arrested Mitchell. Deputy Shike admitted that he did not find a weapon on Mitchell after he was arrested and searched. But Deputy Shike averred that he believed he could have died. Finally, Deputy Shike explained that his patrol car had a dashboard camera that caught the events in the parking lot that day. The State submitted the video recording into evidence.[3]
Deputy Rangel. Deputy Rangel testified next. He stated that he responded to Deputy Shike's call for back-up. He remained downstairs while Deputy Shike went upstairs, and he ran out when he heard Deputy Shike say Mitchell had jumped out of the window. According to Deputy Rangel, he and Lieutenant Zitzman chased Mitchell while Lieutenant Zitzman attempted to taser Mitchell. The officers tackled Mitchell and told him to stop resisting. Mitchell first tried to grab Lieutenant Zitzman's gun but could not. Then, as Deputy Rangel was trying to get Mitchell away from Lieutenant Zitzman's gun, Mitchell grabbed Deputy Rangel's holster and removed the gun.
Deputy Rangel testified that he was in imminent fear for his and the other officers' safety because Mitchell had the gun in his hands and controlled it. Mitchell had the gun underneath him and initially pointed it at Deputy Rangel and then at Deputy Shike. Deputy Rangel testified that he tried to wrestle the gun away from Mitchell while Mitchell cradled it.
At some point, Deputy Rangel saw Mitchell pull the trigger of the gun. Deputy Rangel testified that, at that moment too, he was in imminent fear for his life and worried that any of the officers could have been killed. Mitchell continued to point the gun towards them and pulled the *784 trigger about ten times, but the gun contained no more bullets. Eventually, Mitchell pointed the gun into his own mouth and pulled the trigger about five more times. He said about three to four times that he wanted to kill himself, and he asked the officers to kill him.
Lieutenant Zitzman. Lieutenant Zitzman also testified at trial, and his story was consistent with that of Deputy Rangel and Deputy Shike. He testified that during the struggle with Mitchell in the parking lot, Mitchell took the gun from Deputy Rangel's holster, and Lieutenant Zitzman could not see the gun or where it was pointed, but he feared for all of their safety. He testified that, after seeing the video, he learned that the bullet Mitchell managed to shoot came inches from hitting his right thigh.
Corey Jones. Corey Jones testified as well. He stated that he lived with his wife Angelica, Mitchell's sister. According to Jones, he came home on January 1, 2016 with his baby, and they were sitting downstairs in their apartment when he heard Mitchell and his girlfriend fighting upstairs. He heard a scuffle and then what he thought was a gunshot. He immediately grabbed his child, ran outside, and used a neighbor's phone to call the police. Jones testified that he did not own a gun and did not see anyone shoot one.
Angelica Mitchell. Angelica testified that she arrived home from work on January 1, 2016, and, at that time, she did not realize the police had been called. She told Mitchell and his girlfriend that they needed to leave if they were fighting. Angelica walked outside and saw police in front of her apartment.[4] Angelica then saw Mitchell jump from the window, after which two officers tackled and tased him. She did not see Mitchell grab any of the officer's guns. When she heard a gunshot, she started yelling that the officers had killed her brother. Angelica testified that she believed Mitchell wanted to kill himself when he took the gun from the police officer, and she did not think he put her or the officers' lives in danger.
Cardero Mitchell. Finally, Mitchell testified. He stated that he and his girlfriend were fighting on January 1, 2016, but he denied hitting his girlfriend or firing a gun during their fight. Mitchell testified that when Angelica came home, she told them to leave. Mitchell saw the police officers approach the apartment, and he went upstairs to check on his baby. When he heard the officer coming upstairs, Mitchell testified that he "had to go" because he had an assault case pending and he did not want to go back to jail.[5] Mitchell testified that he jumped out the window and ran but was tased by a police officer.
Mitchell admitted that he tried to grab Lieutenant Zitzman's gun. He testified that he tried to grab the gun because he wanted to shoot himself. He explained that he was unable to obtain Lieutenant Zitzman's gun but managed to secure Deputy Rangel's. He asserted that the officers did not believe that their lives were in danger because, during the struggle, he was screaming that he wanted to shoot himself. According to Mitchell, Deputy Shike asked him what he was doing and why he wanted to kill himself. Mitchell denied pointing the gun at any of the officers. He admitted, however, that he shot the gun and that he did not know where it was aimed. Mitchell testified that he did not realize that he was *785 putting the officers in fear in that moment. But he admitted that "now looking at it and hearing the details of the case" he "put a lot of people at risk" and "put people's life [sic] in danger." He stated that he "never intentionally tried to hurt anybody" but himself.[6]
Mitchell also testified that he was trying to commit "suicide by cop," which meant putting himself "at risk of being shot or killed by a cop by making the choice that can make the cop use excessive force or deadly force." Mitchell admitted that he intended the cops to feel threatened and intended to "inflict fear" by taking Deputy Rangel's gun. He also testified that he knew they would feel threatened by his conduct.
B. Punishment phase
The jury convicted Mitchell of aggravated assault of a peace officer, and the trial continued to the punishment phase. During the punishment phase, numerous witnesses testified including Michael Squyres, a deputy investigator with the Harris County Sheriff's office.
At issue here, Squyres testified that Mitchell was in a gang. Squyres testified that he currently works in the gang intelligence unit of the Harris County Sheriff's Office and has worked there for 18 years. He taught at the academy, attended quarterly trainings and conferences, and had interviewed "probably thousands of gang members in that time."
He testified that he was familiar with the gang 5-Deuce Hoova Crips. He asserted that 5-Deuce Hoova Crips is a violent street gang that is involved in a multitude of activities. He personally worked on 5-Deuce Hoova Crips cases.
Squyres also testified that he had the opportunity to evaluate Mitchell's photographs and in particular a tattoo on Mitchell's left inner forearm-a crown with three points, the numbers 5 and 2, and the word HOOVA spelled with the "A" inverted. He averred that this is a symbol used by the Hoova Crips gang.
Squyres testified that his opinion was based on information in a "gang tracker database" maintained by the Houston Police Department. That information identified Mitchell as a 5-Deuce Hoova Crip. Squyres admitted that he had not interviewed Mitchell, nor had he interviewed people about Mitchell, and he did not know when Mitchell had gotten the tattoo with the Hoova Crips symbol.
Mitchell's counsel objected to Squyres's opinion, but the trial court overruled the objection. Accordingly, Squyres testified that his opinion was that Mitchell was a 5-Deuce Hoova Crip.[7]
Mitchell also testified during the punishment phase. He testified about his background and admitted that he joined a gang when he was 12 years old. He said that he was involved in the gang for approximately eight years. He asserted that he is no longer a gang member.[8]
Following the presentation of evidence during the punishment phase, the jury sentenced Mitchell to 50 years in prison. Mitchell appealed.
*786 Sufficiency of the Evidence
Mitchell asserts that the evidence was insufficient to establish the mental state necessary to support his conviction for aggravated assault. Mitchell further asserts that the evidence was insufficient to establish that the officers were placed in fear of imminent bodily harm. We disagree on both grounds.
A. Standard of Review
We review the sufficiency of the evidence in the light most favorable to the verdict and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Acosta v. State , 429 S.W.3d 621, 624-25 (Tex. Crim. App. 2014). This standard of review allows a jury to resolve fact issues and to draw reasonable inferences from the evidence. Thomas v. State , 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ). With respect to testimony of witnesses, the jury is the sole judge of the testimony's credibility and weight, and when the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. Id. (citing Jackson , 443 U.S. at 319, 99 S.Ct. at 2789 ).
In a sufficiency inquiry, direct evidence and circumstantial evidence are equally probative. Tate v. State , 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). Not every fact presented must directly indicate that the defendant is guilty, so long as the cumulative force of the evidence is sufficient to support a finding of guilt. Nowlin v. State , 473 S.W.3d 312, 317 (Tex. Crim. App. 2015).
B. Applicable Law
The Texas Penal Code is clear and sets forth the applicable standards here. Assault is defined as "intentionally or knowingly threaten[ing] another with imminent bodily injury." TEX. PENAL CODE § 22.01(a)(2). One commits the offense of aggravated assault if the person commits assault and (1) causes serious bodily injury to another; or (2) uses or exhibits a deadly weapon during the commission of the assault. Id. § 22.02(a). Aggravated assault is a felony of the first degree if it is "against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant." Id. § 22.02(b)(2)(B).
"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Id. § 6.03(a). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." Id. § 6.03(b). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." Id. The Texas Penal Code defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." Id. § 1.07(a)(8). A firearm is considered a deadly weapon. Id. § 1.07(a)(17)(A).
The act of pointing a loaded gun at someone, by itself, is threatening conduct that supports a conviction for aggravated assault. Jones v. State , 500 S.W.3d 106, 113 (Tex. App.-Houston [1st Dist.] 2016, no pet.).
C. Analysis
Sufficient evidence supported the conviction. We thus reject Mitchell's contentions that (1) he lacked the requisite mental *787 state to be found guilty of aggravated assault because "he did not intend to harm the deputies," and (2) the State did not prove beyond a reasonable doubt that the officers were in fear of imminent bodily injury. We address each in turn.
Mental state. A jury may infer the existence of knowledge or intent from "any facts tending to prove its existence," such as the defendant's acts, words, or conduct. Dobbins v. State , 228 S.W.3d 761, 765 (Tex. App.-Houston [14th Dist.] 2007, pet dism'd) ; see also Jones , 500 S.W.3d at 113. The law does not require evidence of threatening language or gestures to prove knowledge of intent. Dobbins , 228 S.W.3d at 765.
Here, sufficient evidence showed that Mitchell intentionally or knowingly threatened Deputy Shike with imminent bodily injury. Mitchell himself admitted that he intended to "threaten" the officers or "inflict fear" when he took Deputy Rangel's gun. He also conceded that he knew the officers would feel threatened by his taking of the gun. By his own admissions, he intentionally and knowingly threatened the officers with imminent bodily injury.
All three officers offered supporting testimony. They testified that Mitchell wrestled away Deputy Rangel's gun. Deputy Rangel testified that Mitchell pointed the gun at Deputy Shike and him. Mitchell fired a bullet and tried to shoot the gun several more times.[9] And the fired bullet came inches from hitting Lieutenant Zitzman. Each of the three officers testified that he feared for his safety when Mitchell grabbed Deputy Rangel's gun.
The incident was also caught on Deputy Shike's dashboard camera, and the jury watched the video, which was generally consistent with the officers' testimony. Yes, Mitchell also stated that he wanted to kill himself and that he eventually put the barrel of the gun in his mouth. But the jury was free to assess all of the evidence and the witnesses' credibility and make its determination.
Viewing the evidence in the light most favorable to the verdict, sufficient evidence allowed a rational jury to find, beyond a reasonable doubt, that Mitchell intended to threaten or knowingly threatened Deputy Shike with imminent bodily injury. Thus, the evidence is legally and factually sufficient to support Mitchell's conviction. See Carr v. State , No. 14-09-00322-CR, 2010 WL 2835663, at *5 (Tex. App.-Houston [14th Dist.] July 20, 2010, pet. ref'd) (mem. op., not designated for publication) (sufficient evidence supported intent for aggravated assault of peace officer where appellant pointed gun in officer's direction and gun was one foot from officer's face); Barnes v. State , Nos. 14-05-00144-CR, 14-05-00145-CR, 2006 WL 2548186, at *7-8 (Tex. App.-Houston [14th Dist.] Sept. 5, 2006, pet. ref'd) (mem. op., not designated for publication) (evidence that appellant wrestled for officer's gun, retrieved it, and shot it was sufficient to support requisite intent for conviction for aggravated assault of police officer, even though some evidence existed that appellant harbored suicidal thoughts).
Imminent Bodily Injury. We also find sufficient evidence that Officer Shike feared imminent bodily injury. Under Texas law, "[t]he display of a deadly weapon of and within itself constitutes a threat of the required imminent harm." Sosa v. State , 177 S.W.3d 227, 231 (Tex. App.-Houston [1st Dist.] 2005, no pet.) (citing Robinson v. State , 596 S.W.2d 130, 133 n.7 (Tex. Crim. App. 1980) ). Here, Mitchell had a firearm, a deadly weapon, which he fired *788 and tried to keep firing while Deputy Shike, Deputy Rangel, and Lieutenant Zitzman attempted to restrain him. All three officers testified that they were in fear for their safety. Deputy Shike specifically testified that he feared imminent bodily harm when Mitchell grabbed the gun. Based on this record, sufficient evidence supported the jury's determination that Mitchell threatened the officers, and in particular Deputy Shike, with imminent bodily injury. See Patterson v. State , 639 S.W.2d 695, 696-97 (Tex. Crim. App. [Panel Op.] 1982) (sufficient evidence showed fear of imminent bodily injury where complainant testified that she (1) believed appellant had a gun, (2) feared imminent body injury, and (3) felt threatened with physical harm).
We overrule Mitchell's first issue.
Admissibility of Evidence
In his second issue, Mitchell asserts that the trial court erred by admitting expert testimony on the 5-Deuce Hoova Crips gang. Because the trial court acted within its discretion in admitting the testimony at issue, we reject Mitchell's contention.
A. Standard of Review
The trial court has broad discretion in determining the admissibility of evidence presented at the punishment phase of the trial. Delacerda v. State , 425 S.W.3d 367, 400 (Tex. App.-Houston [1st Dist.] 2011, pet. ref'd). During the punishment phase, "evidence may be offered ... as to any matter the court deems relevant," including evidence of the defendant's reputation or character. TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1).
Texas Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if the expert's scientific, technical, or specialized knowledge will help the fact finder to understand the evidence or to determine a fact in issue. TEX. R. EVID. 702. Thus, before the trial court admits expert testimony under Rule 702, it must be satisfied that: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact finder in deciding the case. Id. (citing Davis v. State , 329 S.W.3d 798, 813 (Tex. Crim. App. 2010) ). Courts commonly refer to these conditions as (1) qualifications, (2) reliability, and (3) relevance. Id.
We review the trial court's decision to admit expert testimony for an abuse of discretion. Phillips v. State , 534 S.W.3d 644, 655 (Tex. App.-Houston [1st Dist.] 2017, no pet.).
B. Analysis
The State sufficiently established that Squyres was qualified to testify as an expert and that his testimony was reliable and relevant. The trial court did not abuse its discretion in admitting the testimony.
1. Squyres's qualifications
To testify as an expert witness, a witness must have a sufficient background in the particular field, and the trial court must determine whether that background "goes to the matter on which the witness is to give an opinion." Phillips , 534 S.W.3d at 655 (quoting Davis , 329 S.W.3d at 813 ). The proponent of the expert testimony must establish that the witness has knowledge, skill, experience, training, or education regarding the specific issue, and "the focus is on the fit between the subject matter at issue and the expert's familiarity with it." Id.
Here, Squyres demonstrated experience and familiarity with both gang *789 intelligence generally and the 5-Deuce Hoova Crips specifically. He testified that he had 18 years of experience working in the gang intelligence unit of the Harris County Sheriff's Office. He explained that he teaches at the academy, attends quarterly trainings and conferences, and has interviewed "probably thousands of gang members." Furthermore, he testified that he was familiar with the gang 5-Deuce Hoova Crips and had worked on several cases involving the gang.
The State accordingly established that Squyres had sufficient knowledge, experience, and training concerning street gangs in Houston, including the 5-Deuce Hoova Crips, that he could render an expert opinion on this topic. See id. at 656-57.
2. Reliability of Squyres's expert opinion testimony
The State also demonstrated sufficiently that Squyres's testimony was reliable. In his sole argument on this point, Mitchell contends that Squyres's testimony was not reliable because it was based solely on his tattoo. But, "[t]his Court has previously held that expert opinion testimony that a defendant's tattoos had distinctive meanings and were common in a particular gang supplied 'sound evidence' of the defendant's gang membership." Id. at 657 (citing Garcia v. State , 239 S.W.3d 862, 865 (Tex. App.-Houston [1st Dist.] 2007, pet. ref'd) ). Moreover, Mitchell himself admitted that he was a member of the gang for eight years.
3. Relevance of Squyres's expert opinion testimony
Finally, the State sufficiently showed that Squyres's testimony was relevant. "As a general matter, testimony regarding a defendant's affiliation with a gang may be relevant and admissible at the punishment phase to show the defendant's character." Garcia , 239 S.W.3d at 866-67.
Mitchell argues that evidence regarding his gang affiliation was irrelevant because there was insufficient proof that he was a current, rather than past, member of the Crips. But his present or past gang affiliation is evidence of his character, and he need not still be affiliated with the gang for the evidence to be relevant and admissible during the punishment phase. See Ho v. State , 171 S.W.3d 295, 305 (Tex. App.-Houston [14th Dist.] 2005, pet. ref'd) ("Even if appellant was no longer affiliated with the gang at the time of the shooting, evidence that he was a gang member is relevant-and thus admissible at punishment-because it relates to his character."); see also Garcia , 239 S.W.3d at 867 (appellant's tattoos were relevant and admissible evidence of gang membership, despite appellant's denial of membership).
The trial court did not abuse its discretion in admitting Squyres's expert testimony regarding Mitchell's gang involvement.
We overrule Mitchell's second issue.
Conclusion
We affirm the judgment of the trial court.

The State submitted the audio recording of Corey Jones's 911 call into evidence. In it, Jones reports that he was downstairs and heard Mitchell and his girlfriend arguing upstairs. He then heard a gunshot. Jones said he grabbed his baby and ran out of the house.

According to Deputy Shike's testimony, Angelica provided them verbal consent to enter. She later (after they had entered) gave them written consent to search the house. The State submitted into evidence the written consent form dated January 1, 2016 and signed by Angelica.

The video is generally consistent with Deputy Shike's testimony. It depicts a man running from two officers while they try to grab and restrain him as another officer approaches to assist. As the officers get the man on the ground, the man reaches for one of the officer's holsters and then the other's and manages to pull out the gun. The video depicts the officers wrestling with the man for the gun, and eventually shows one officer throwing aside the gun's magazine.

Angelica did not recall giving the police permission to enter her home, but she did not say they could not go in. She confirmed that later in the day she signed a written consent to search.

Mitchell also testified that he had previous convictions for "disarming a police officer" and possession of a controlled substance.

Mitchell testified that he never realized that one of the officers had taken the magazine out of the gun. According to Mitchell, he thought the gun still had bullets in it and he raised it to his mouth to shoot himself.

The State also called Mitchell's ex-girlfriend who testified that Mitchell punched her in the face while she was pregnant and then hit her with his car another time when she tried to leave. The State submitted photographs from these incidents into evidence.

Mitchell also called Sonia Rafeet, a private investigator, during the punishment phase. Rafeet expressed her opinion that Mitchell was not an active member of the Crips gang.

Notably, Mitchell testified that he did not realize the magazine had been taken out and continued to shoot the gun, reflecting his intention to keep firing shots.