Opinion issued August 4, 2022



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00141-CR

———————————

**TRAVIS EUGENE KIRKPATRICK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 207th District Court
Comal County, Texas[1]
Trial Court Case No. CR2018-430

**MEMORANDUM OPINION**

---

[1] The Texas Supreme Court transferred this appeal from the Court of Appeals for the Third District of Texas. TEX. GOV'T CODE § 73.001 (authorizing transfer of cases between courts of appeals). We researched relevant case law and did not find any conflict between the precedent of the Court of Appeals for the Third District and that of this Court on any relevant issue in this case. *See* TEX. R. APP. P. 41.3.

Following a bench trial, appellant Travis Eugene Kirkpatrick was convicted of aggravated assault with a deadly weapon and sentenced to 60 years' imprisonment.[2] In two issues, Kirkpatrick contends this Court must reverse his aggravated assault conviction because the trial court (1) erred in rejecting his assertion of the necessity defense, and (2) misapplied the law concerning the necessity defense.

We affirm.

## Background

Between February and June 2017, Kirkpatrick reported two robberies on his property. The first took place on February 16th, during which two shotguns and a hammock were stolen from his house. The second occurred around June 13th or 14th, during which Kirkpatrick's son's motorcycle[3] was stolen from Kirkpatrick's mechanic shop.

Kirkpatrick reported both incidents to the police, but the property was not recovered. Kirkpatrick contacted various friends and associates to attempt to locate

---

[2] In addition to the aggravated assault charge, Kirkpatrick was also indicted on two counts of tampering with physical evidence, as well as unlawful possession of a firearm. The indictment included two enhancement paragraphs for prior felonies. Prior to the trial on the aggravated-assault charge, Kirkpatrick pled guilty to these three charges, as well as two charges pending in another case. After finding Kirkpatrick guilty of aggravated assault with a deadly weapon, the trial court sentenced to Kirkpatrick to sixty years' imprisonment on all six charges.

[3] Kirkpatrick also refers to the stolen vehicle as his son's "dirt bike."

2

information about the people responsible for the burglaries, which Kirkpatrick described as "going hunting." At some point on June 14th, Kirkpatrick learned that Max Sarver, someone who had previously worked at Kirkpatrick's mechanic shop, may have been involved in the burglary of the mechanic shop. After learning of Sarver's alleged involvement from another individual, Kirkpatrick stated that he was going to "[b]eat the brakes off that white boy." Kirkpatrick contacted Sarver directly via text message concerning his stolen property, but Sarver denied having any knowledge or involvement in the robbery. Kirkpatrick later left a voicemail message for Sarver, saying: "Oh, I got something for your b**** a**. Let me find you out and about, b****. I'm going to beat the f****** brakes off you."

The next day, June 15th, Kirkpatrick drove to a 7-Eleven to buy cigars, but they were unavailable, so Kirkpatrick went to the Valero across the street. When he arrived at the Valero, Kirkpatrick saw Sarver's truck parked in a parking lot in front of the convenience store. Kirkpatrick then pulled his Jeep behind, perpendicular to and at least partially blocking, Sarver's truck. After a brief exchange from their vehicles, Kirkpatrick "jumped out of the vehicle to approach [Sarver]," with the intent to confront Sarver about the motorcycle. Sarver backed out of the parking spot, hitting Kirkpatrick's Jeep in the process. Kirkpatrick testified that he thought Sarver was trying to hit him.

As Sarver was driving away, Kirkpatrick testified that Sarver leaned out the window and said, "You want to play, b****." Kirkpatrick testified that, at that point, he did not know if Sarver "was going for a gun or what," and, because he "was already scared," Kirkpatrick pulled out his gun and fired three or four shots at Sarver's truck. Kirkpatrick explained that he shot at Sarver because he believed Sarver was going to either shoot or run over him.

On cross-examination, Kirkpatrick admitted that he did not see his stolen property in Sarver's truck at the time he confronted Sarver at the Valero. He also admitted that he did not know if Sarver was armed, yet he ran up to Sarver anyway. Kirkpatrick further testified that he never saw a gun or weapon in Sarver's possession, that Sarver never made a move to exit his truck or confront Kirkpatrick, and that it was Kirkpatrick who approached Sarver. Further, Kirkpatrick admitted that, after police arrived at the Valero, he denied that he shot a weapon, and instead told them the noise reported was a radiator popping or that he had fired an airgun with airbullets. Kirkpatrick also testified that he could have walked away from the situation or run into the store to ask for help, and that he had other options he could have pursued to ensure his safety. However, Kirkpatrick continued to state that he felt it was necessary for him to use his firearm because he felt his "life was in danger."

After the shooting occurred, surveillance video from the Valero showed Kirkpatrick using his cell phone to contact someone, later identified as Johnny Mohler,[4] an acquaintance of Kirkpatrick's who lived in a nearby neighborhood. A few minutes later, according to the surveillance video, Mohler arrived at the Valero and retrieved items from Kirkpatrick's vehicle and returned to his residence nearby. Kirkpatrick admitted on cross-examination that he had Mohler remove two firearms from his Jeep, the one he shot and a second one from his glovebox in the Jeep.

Shortly after Mohler left the Valero, Kirkpatrick called 9-1-1 to report a hit-and-run incident.[5] In addition to Kirkpatrick, Kylie Munis, an employee at the Valero, and Sarver also placed calls to 9-1-1. Munis reported that there had been an accident at the Valero and possibly shots fired. Sarver informed the 9-1-1 operator that "a man named Travis Kirkpatrick . . . sho[]t at me at the Sac-N-Pac."[6]

The first officers to respond to the scene were Deputy C. Parra, Deputy C. Clark, and shortly thereafter, Deputy J. Crabb from the Comal County Sheriff's Office. Each officer testified at trial. Deputy Parra testified that, once he arrived on

---

[4]    Officer J. Crabb testified that he recognized Mohler on the surveillance video.

[5]    During 9-1-1 call, Kirkpatrick told the 9-1-1 operator: "[T]his guy [at] Valero just took off the whole f****** front of my truck and took off . . . his name is Max, I['ve] got his number, address, everything." Kirkpatrick did not state that he had a firearm or that he shot at Sarver.

[6]    The Sac-N-Pac is the name of the Valero gas station.

scene, he immediately identified Kirkpatrick as one of the 9-1-1 callers. Since the initial report included the possibility of the presence of a weapon, Deputy Parra frisked Kirkpatrick before asking him for further details. When asked what had occurred, Kirkpatrick told Deputy Parra that "another person had hit his vehicle and fled the scene," though he was unable to provide a name or any identifying information of the hit-and-run driver.

Before Deputy Parra entered the Valero, he verbally advised Kirkpatrick of his statutory rights before he handcuffed Kirkpatrick and placed him in the patrol car to wait while he reviewed the surveillance footage. After reviewing the surveillance video, Deputy Parra returned to search Kirkpatrick's vehicle, where he found spent shell casings. Deputy Parra spoke to Kirkpatrick again about the events that had transpired that evening, and Kirkpatrick "continued to report that the other party [Sarver] had struck him and then he claimed that he fired a cap gun [or] . . . some kind of an airgun." Deputy Parra testified that this version of events was not consistent with the muzzle flash he witnessed on the surveillance video, nor was it consistent with the holes found in Sarver's truck. Deputy Parra further testified that, based on his observation of the surveillance video, there was no way for Sarver to have exited his parking spot without hitting Kirkpatrick's vehicle in some way, due to the positioning of the two vehicles relative to each other.

During the search of Kirkpatrick's vehicle, Deputy Parra found an empty black nylon holster for a handgun in the backseat of Kirkpatrick's Jeep. After expressing his concern to Kirkpatrick about an unaccounted for firearm in the community, Kirkpatrick ultimately admitted that he had fired a firearm, and that he had "lost his temper" with Sarver. Deputy Parra testified that Kirkpatrick indicated that he had felt threatened by Sarver and that Sarver had yelled at Kirkpatrick, "I got something else in here for you." Deputy Parra, however, testified that Kirkpatrick's version of events did not seem consistent with the events he had observed on the surveillance video. According to Deputy Parra, from his observation of the surveillance video, Kirkpatrick appeared to be the aggressor, not Sarver. Although Sarver hit Kirkpatrick's Jeep with his truck, Deputy Parra testified that Sarver appeared "to be leaving the scene" at the time he struck Kirkpatrick's Jeep. Deputy Parra further testified that he did not see Sarver with a weapon, and that Sarver did not make any aggressive movement toward Kirkpatrick, use his vehicle in an aggressive manner toward Kirkpatrick, or intentionally ram Kirkpatrick's Jeep. In fact, Deputy Parra testified that at the time Kirkpatrick drew and fired his weapon, Sarver was "pulling away from [Kirkpatrick] towards the highway" and, thus, did not pose any present danger to Kirkpatrick.

Deputy Parra also testified on cross-examination that Kirkpatrick eventually told him that someone had taken the firearm and directed Deputy Parra to the shell

7

casings in his Jeep. Deputy Parra also testified that Kirkpatrick had stated he was in fear for his life at the time of the shooting, that he was a felon and had "lost his cool," and that he was very sorry for what happened.

While Deputy Parra was talking to Kirkpatrick and examining the footage, Deputy Clark responded to the 9-1-1 call from Sarver, who had called from a friend's residence in Foresthill, a neighborhood situated near the Valero. She testified that Sarver was "fired up" and "sh[a]ken up" when he tried to recount the incident that evening. While she was there, Deputy Clark took pictures of Sarver's vehicle and noted the bullet holes in the truck's body. Sarver also played a voicemail for Deputy Clark that was left by Kirkpatrick on Sarver's phone, during which Kirkpatrick stated that he was going "to beat the f***ing brakes off of [Sarver]."[7] Deputy Clark testified that she heard this voicemail and perceived it as threatening.

Deputy Crabb testified that he had been aware of Kirkpatrick and his status as a convicted felon before he responded to Kirkpatrick's initial 9-1-1 call. While reviewing the surveillance footage from the Valero that evening, Deputy Crabb recognized Sarver and Mohler, the man whom Kirkpatrick requested to take items from Kirkpatrick's Jeep after the shooting. Since Deputy Crabb was familiar with

---

[7] This voicemail is recorded on Deputy Clark's dash cam video, and the portion of that dash cam video containing the voicemail recording and Deputy Clark's identification of the phone number from which the voicemail came was introduced as State's Exhibit 29.

Mohler and knew where he lived, Deputy Crabb visited Mohler and searched his residence. During the search, Deputy Crabb found two firearms, one in a holster and the other not, both of which had been concealed near Mohler's water heater. From what Deputy Crabb had observed on the video and his conversation with Mohler, he believed that these firearms had been taken from Kirkpatrick's vehicle.

## Necessity Defense

In his first issue, Kirkpatrick challenges the legal sufficiency of the evidence to defeat his necessity defense. In his second, related issue, Kirkpatrick argues that the trial court misapplied the law when it failed to consider his necessity defense.

### A. Standard of Review

When a defendant challenges the legal sufficiency of the evidence to support rejection of a defense such as necessity, the question is not "whether the State presented evidence which refuted appellant's [defensive] evidence." *Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)); *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Rather, the reviewing court must ask whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against the defendant on the necessity defense beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 9, 14.

9

After a defendant has introduced some evidence supporting a defense, the State continues to bear the burden to prove its case beyond a reasonable doubt, but it does not have a burden to introduce evidence to disprove the defense. *Zuliani*, 97 S.W.3d at 594. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. art. 38.04; *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). When performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

## B. Applicable Law

Conduct is justified if: (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear. TEX. PENAL CODE § 9.22.

The Penal Code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Harper v. State*, 508 S.W.3d 461, 468 (Tex. App.—Fort Worth 2015, pet. ref'd) (quoting TEX. PENAL CODE § 1.07(a)(42)). "Harm" means "anything reasonably regarded as loss,

disadvantage, or injury, including harm to another person in whose welfare the person affected is interested." TEX. PENAL CODE § 1.07(a)(25). "Imminent" means something that is immediate, something that is at the point of happening and not about to happen. *See Pennington v. State*, 54 S.W.3d 852, 857 (Tex. App.—Fort Worth 2001, pet. ref'd); *see also Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016) (necessity defense applies when action is needed "'immediately' (i.e., now) to avoid 'imminent' harm (i.e., harm that is near at hand)"). More than a generalized fear of harm is required to raise the issue of imminent harm. *Stefanoff v. State*, 78 S.W.3d 496, 501 (Tex. App.—Austin 2002, pet. ref'd); *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.—Fort Worth 1997, no pet.).

To raise the necessity defense, a defendant must admit that he committed the offense charged and then offer the alleged necessity as a justification for his conduct. *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999); *see also Juarez v. State*, 308 S.W.3d 398, 401–02 (Tex. Crim. App. 2010).

## C. Sufficiency of the Evidence to Support the Trial Court's Rejection of Kirkpatrick's Necessity Defense

Viewing all the evidence in the light most favorable to the verdict and deferring to the factfinder's determination concerning the credibility of the

witnesses, we conclude that the trial court could have rationally found the elements of aggravated assault beyond a reasonable doubt.[8] *See Saxton*, 804 S.W.2d at 914.

A person commits the offense of assault if the person intentionally or knowingly threatens another with imminent bodily injury. TEX. PENAL CODE § 22.01(a)(2). Aggravated assault occurs if the person commits an assault under Section 22.01 and the person uses or exhibits a deadly weapon during the commission of the assault. *Id.* § 22.02(a)(2). "Deadly weapon" means a "firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury[.]" *Id.* § 1.07(17)(A). Kirkpatrick testified in his own defense and admitted that after Sarver backed out of the parking spot into Kirkpatrick's Jeep, Kirkpatrick pulled out his gun and fired three or four shots at Sarver's truck. Kirkpatrick's testimony was confirmed by the surveillance video from the Valero that was entered into evidence at trial. Kirkpatrick does not contest that his actions amount to assault in violation of Section 22.01, or that the firearm constituted a deadly weapon. *See, e.g.*, *Mitchell v. State*, 546 S.W.3d 780, 786 (Tex. App.—

---

[8] The State contends that Kirkpatrick was not entitled to raise the defense of necessity because, when deadly force in self-defense is the conduct that is allegedly "immediately necessary" under subsection (1) of Section 9.22, the defense of necessity does not apply. *See, e.g.*, *Butler v. State*, 663 S.W.2d 492, 496 (Tex. App.—Dallas 1983), *aff'd*, 736 S.W.2d 668 (Tex. Crim. App. 1987) (prescribing this rule in a murder case); *Banks v. State*, No. 14-00-00650-CR, 2002 WL 27265, at *5 (Tex. App.—Houston [14th Dist.] Jan. 10, 2002, pet. ref'd) (not designated for publication). We do not decide this question because, assuming Kirkpatrick was entitled to raise the necessity defense, as explained in detail above, we hold the evidence was legally sufficient to support the trial court's rejection of that defense.

Houston [1st Dist.] 2018, no pet.) (citing *Jones v. State*, 500 S.W.3d 106, 113 (Tex. App.—Houston [1st Dist.] 2016, no pet.)) ("The act of pointing a loaded gun at someone, by itself, is threatening conduct that supports a conviction for aggravated assault."); *see also* TEX. PENAL CODE §§ 22.01, 22.02. Indeed, if he had denied these things, the defense of necessity would not have been available to him. *See Juarez*, 308 S.W.3d at 404 (noting that justification defenses such as necessity fall within confession-and-avoidance doctrine, which requires defendant to admit charged conduct before defense will be available).

Rather, his sole defense is that his conduct was necessary because he was in fear for his life and to prevent Sarver from either shooting him or running over him with his truck. But viewing all the evidence in the light most favorable to the verdict and deferring to the factfinder's credibility determinations, we conclude that the trial court could have rationally found against Kirkpatrick's necessity defense beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914.

The trial court heard testimony from Officer Parra that, from his observation of the surveillance video, Kirkpatrick appeared to be the aggressor, not Sarver. Although Sarver hit Kirkpatrick's Jeep with his truck, Deputy Parra testified that Sarver appeared "to be leaving the scene" at the time he struck Kirkpatrick's Jeep. Officer Parra further testified that he did not see Sarver with a weapon, and that Sarver did not make any aggressive movement toward Kirkpatrick, use his vehicle

13

in an aggressive manner toward Kirkpatrick, or intentionally ram Kirkpatrick's Jeep. In fact, Deputy Parra testified that at the time Kirkpatrick drew and fired his weapon, Sarver was "pulling away from [Kirkpatrick] towards the highway" and, thus, did not pose any present danger to Kirkpatrick. The surveillance video shows Kirkpatrick shoot at Sarver not as he is reversing out of the parking spot and into Kirkpatrick's Jeep, but seconds later, after Sarver is pulling away and out of the parking lot. Moreover, the surveillance video does not show Sarver with a weapon or ever exit his vehicle. Kirkpatrick also admitted during his testimony that he never saw a gun or weapon in Sarver's possession, that Sarver never made a move to exit his truck or confront Kirkpatrick, and that it was Kirkpatrick who approached Sarver. Based on this testimony, the trial court could have rationally believed that Sarver did not possess a weapon or make any threatening or aggressive movements toward Kirkpatrick and, therefore, Kirkpatrick was never in fear of imminent harm. *See Hightower v. State*, No. 09-16-00289-CR, 2017 WL 4413936, at *3 (Tex. App.— Beaumont Oct. 4, 2017, pet. ref'd) (mem. op., not designated for publication) (holding jury could have rationally believed that victim did not pull knife on appellant and, therefore, appellant was never in fear of imminent harm, because multiple witnesses testified they did not see victim pull knife and that appellant was aggressor).

14

Although Kirkpatrick testified that he was afraid for his life because he thought Sarver might have a gun or might run over him, he admitted that he did not know if Sarver "was going for a gun or what," but that because he "was already scared," Kirkpatrick pulled out his gun and fired three or four shots at Sarver's truck. By his own admission, Kirkpatrick did not know Sarver's intentions after Sarver hit his Jeep, and his generalized fear of injury is insufficient to support a conclusion that his actions were necessary to avoid imminent harm. *See Hightower*, 2017 WL 4413936, at \*3 ("Although the jury heard evidence that [victim] was known to carry a knife or box cutter and had a violent past, more than a generalized fear of immediate harm is required."); *Pruiett v. State*, No. 05-12-00131-CR, 2013 WL 1277861, at \*3 (Tex. App.—Dallas Feb. 25, 2013, pet. ref'd) (mem. op., not designated for publication) ("By his own testimony, appellant admitted he did not know [victim's] intentions when she reached forward, and his generalized fear of injury was insufficient to support a conclusion he believed his actions were necessary to avoid imminent harm."). Even if the trial court believed Kirkpatrick's testimony that he was in fear for his life because Sarver may have had a gun or was trying to run him over, the trial court could have also rationally found that it was not reasonable for Kirkpatrick to believe shooting the gun at Sarver was immediately necessary to avoid imminent harm because Kirkpatrick admitted he could have walked away from the situation or run into the store to ask for help, and that he had

other options he could have pursued to ensure his safety. *See Hightower*, 2017 WL 4413936, at *3 ("Even if the jury believed [appellant's] testimony that he saw [victim] pull a knife, the jury could have also rationally found that [appellant] did not reasonably believe possessing the gun was immediately necessary to avoid imminent harm because [appellant] could have retreated or called the police with the cell phone he had on his person."); *cf. Redden v. State*, No. 03-06-00566-CR, 2008 WL 482292, at *5 (Tex. App.—Austin Feb. 21, 2008, pet. ref'd) (mem. op., not designated for publication) (holding defendant did not show counsel's failure to request jury instruction on necessity prejudiced his defense because defendant could not show he was entitled to necessity instruction, in part, where evidence showed he had other "readily available options other than impersonating a police officer"); *Arnwine v. State*, 20 S.W.3d 155, 160 (Tex. App.—Texarkana 2000, no pet.) ("It has been held that the existence of lawful alternatives to the commission of a criminal act may preclude a defendant from the defense of justification by necessity.").

Finally, the trial court could have rationally doubted Kirkpatrick's credibility based on (1) his admission that he called 9-1-1 to report a hit-and-run, but made no mention that he fired a gun at Sarver, (2) his admission that he lied to the police during his initial statements and denied possessing or firing a weapon, and (3) his admission that he picked up the shell casings and placed them in his Jeep and called a friend to come retrieve the guns from his vehicle before police arrived. *See Smith*

16

*v. State*, No. 02-19-00036-CR, 2020 WL 579118, at *4 (Tex. App.—Fort Worth Feb. 6, 2020, pet. ref'd) (mem. op., not designated for publication) (deferring to jury's rejection of necessity defense, in part, because of appellant's admission that he initially lied to police about the source of his wife's injuries could have rationally led the jury to doubt appellant's credibility); *Hightower*, 2017 WL 4413936, at *3 (deferring to the jury's rejection of a necessity defense, in part because appellant's "admission that he initially lied to police" could have rationally led the jury to doubt appellant's credibility). Therefore, we conclude that the above evidence is sufficient to support the trial court's rejection of Kirkpatrick's necessity defense. *See Saxton*, 804 S.W.2d at 914.

We overrule Kirkpatrick's first issue.

**D.    The Trial Court Did Not Misapply the Law Related to the Necessity Defense**

In his second, related issue, Kirkpatrick argues that the trial court misapplied the law by focusing on the deadly-force-in-defense-of-others defense, under Section 9.32 of the Texas Penal Code, instead of the necessity defense. By allegedly considering only the defense under section 9.32, Kirkpatrick argues that the trial court failed to properly consider his necessity defense. Kirkpatrick also argues that this Court should consider this issue under a de novo standard of review. We disagree.

First, we do not agree with Kirkpatrick that we are required to apply a de novo standard of review in analyzing this issue. The case cited by Kirkpatrick for this proposition, *In re E.O.E.*, 508 S.W.3d 613, 622 (Tex. App.—El Paso 2016, no pet.), dealt with the appellate court's review of a trial court's decision to deny a motion to suppress, not whether there was sufficient evidence to support a trial court's rejection of a necessity defense. Kirkpatrick has cited to no authority to demonstrate why we should depart from the standard of review cited above, and we decline to do so.

Second, we do not agree with Kirkpatrick that the trial court failed to analyze the necessity defense. In support of this argument, Kirkpatrick points to the following exchange that occurred between the trial court and counsel during closing arguments:

> DEFENSE: And, Your Honor, I just ask the Court to consider the necessity defense in this. My client clearly believes that his conduct was immediate and necessary to avoid imminent harm. He thought he was being attacked. He thought he was going to get shot at, so he did what he thought was best. And right or wrong, that's what was in his mind.
>
> THE STATE: And if you want to look at whether or not he thought what he did was right or wrong, just look at his actions immediately afterwards. He's getting rid of the evidence and he's lying to the police about what happened.
>
> THE COURT: As I asked him, the covering up and not telling the truth and not asserting that what I did here was because I was trying to defend myself, [defense counsel], it looks a little difficult to -- It looks like I'm – I'm thinking this through and I'm thinking up defenses to it. And --

18

and when we look at 9.32, deadly force in defense of a person, it has a provision. It says in there, you can use deadly force if you did not provoke the person against whom the force was used.

DEFENSE: That's 9.22, Your Honor?

THE COURT: 9.32. 9.32.

DEFENSE: We're talking about – I'm also asking the Court to look at 9.22.

THE COURT: 9.22?

DEFENSE: Necessity defense.

THE COURT: Oh, necessity defense. Are you sure it's 9.22?

DEFENSE: I think so.

THE COURT: Let's see. 9.22.

DEFENSE: Yes, sir.

THE COURT: Okay. Conduct is justified -- well, it's got two standards in there: [r]easonably believe and immediately necessary to avoid imminent harm, and desirability and urgency of avoiding the harm clearly outweigh according to reasonable standards the harm sought to be prevented. So it's a --

DEFENSE: A reasonable standard would be like a reasonable man standard that would be in his eyes.

THE STATE: A reasonable person in his shoes.

DEFENSE: Right.

THE STATE: However, again, we have a person who in his shoes would still have the ability to retreat in that situation. So it's not reasonably necessary.

THE COURT: Did you find what I found in 9.32, that section?

THE STATE: I did, Judge.

19

THE COURT: And you think that applies? It says, He did not provoke the person against who the force was used.

THE STATE: I believe he provoked.

THE COURT: Pardon?

THE STATE: I believe he provoked.

THE COURT: That's what I'm looking at. He created this situation by doing this, leaving a verbal threat the night before, creating this situation at a bad time of the night.

THE STATE: Approaching him in the manner that he did and the aggressive nature of the approach from the video.

THE COURT: Mr. Kirkpatrick basically tells me on the witness stand that, Yeah, I really shouldn't have done this. And he answered at the end of cross-examination – let's see if I can find it now. Let's see. Where was it? I think the last – last question you asked him on cross-examination, he – it was a good question in my view. And he answered, There were other options I could have used to ensure my safety. He used those words. I wrote that down. So he even testified under oath that there were other options he could have used to ensure his safety besides using deadly force. So when he testifies under oath, it pretty well does away with the reason for using deadly force. And that's why we have these strictures in this deadly force in the Penal Code, I mean, before you get to use it. And even it applies to police officers the same way.

Based on this exchange, it is clear the trial court considered the necessity defense raised by Kirkpatrick. The trial court recited the language of Section 9.22 and noted that it required a reasonable person standard and that the conduct in question be immediately necessary to avoid imminent harm. After this exchange, counsel for the State argued that a reasonable person in Kirkpatrick's "shoes would still have the ability to retreat in that situation. So [Kirkpatrick's firing of his gun

20

was] not reasonably necessary." The trial court appeared to agree, noting that Kirkpatrick admitted there were other options he could have used to ensure his safety. That this discussion also related to another defense, i.e., defense of a person under Section 9.32, does not mean that the trial court failed to or refused to consider the necessity defense asserted by Kirkpatrick.

In a bench trial, we presume that the trial court correctly applied the law to the evidence, including defensive theories fairly raised by the evidence. *Dearborn*, 420 S.W.3d at 378. Kirkpatrick does not point to any evidence in the record that contradicts this presumption, and we have concluded above there was sufficient evidence for the trial court as factfinder to find beyond a reasonable doubt against a justification defense of necessity. We therefore overrule Kirkpatrick's second issue.

## Conclusion

We affirm the trial court's judgment.


Amparo Guerra
Justice

Panel consists of Justices Landau, Guerra, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).

21